# In The Matter Of:

*VICTOR M. BROWN vs.*

*BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.*

---

*VICTOR M. BROWN*

*August 20, 2014*

---



## JPA REPORTING, LLC

### CERTIFIED COURT REPORTERS

1776 PEACHTREE STREET, N.W.

SUITE 230-S

ATLANTA, GEORGIA 30309

404-853-1811

1-888-947-2963

*Original File 0820Brown14.txt*

*Min-U-Script® with Word Index*

VICTOR M. BROWN vs.
BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.

VICTOR M. BROWN
August 20, 2014

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

VICTOR M. BROWN,

        Plaintiff,

    vs.

BOARD OF REGENTS OF THE
UNIVERSITY SYSTEM OF
GEORGIA; IVELAW GRIFFITH,
individually and in his
official capacity as Fort
Valley State University
("FVSU") President; LINDA
NOBLE, individually and in
her official capacity as
FVSU Interim Provost &
Vice President for
Academic Affairs; EDWARD
HILL, individually and in
his official capacity as
FVSU Dean of the College
of Education; and TRICIA
ADDISON, individually and
in her official capacity
as FVSU Chief Human
Resources Officer,

        Defendants.

CIVIL ACTION

FILE NO.

1:14-cv-365-WBH-LTW

DEPOSITION OF
VICTOR M. BROWN

Wednesday, August 20, 2014

Page 2

Wednesday, August 20, 2014

10:04 a.m.

233 Peachtree Street, NE
Suite 1245
Atlanta, Georgia

Kate Cochran, RPR, CCR-2722

APPEARANCES OF COUNSEL

On behalf of the Plaintiff:

REGINA S. MOLDEN, Esq.
Molden & Holley
233 Peachtree Street, NE
Suite 1245
Atlanta, Georgia 30303
404-324-4500
Rmolden@moldenholley.com

On behalf of the Defendants:

CHRISTOPHER A. MCGRAW, Esq.
Office of the Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia 30334-1300
404-656-3385
Cmcgraw@law.ga.gov

On behalf of Fort Valley State University:

CHARLES E. JONES, Esq.
Jones & Oliver
102 Peachtree Street
PO Box 180
Fort Valley, Georgia 31030
478-822-9962
Jandoatty@aol.com

Page 3

TABLE OF CONTENTS

EXAMINATION                                    PAGE

Examination by Mr. McGraw                         5

- - -

Defendants'
Exhibit          DESCRIPTION                   PAGE

Exhibit 1    Offer Letter                        31
             March 8, 2013

Exhibit 2    Acceptance Letter                   33
             March 15, 2013

Exhibit 3    Response to Acceptance Letter       33
             March 19, 2013

Exhibit 4    Letter Awarding Rank of Associate   38
             Professor with Tenure
             May 30, 3013

Exhibit 5    Letter Retracting Tenure            42
             July 3, 2013

Exhibit 6    Contract for Tenured Personnel      55
             June 26, 2013

Exhibit 7    Contract for Non-Tenure on          57
             Track Personnel
             July 18, 2013

Exhibit 8    Linda Noble Email                   74
             August 29, 2013

Page 4

Exhibit 9    Letter From Linda Noble to Dr.     82
             Brown
             September 18, 2013

Exhibit 10   Non-Renewal Contract Letter         83
             September 18, 2014

Exhibit 11   Contract for Assistant Professor    84

Exhibit 12   Letter From Victor Brown to         86
             Linda Noble
             September 27, 2013

Exhibit 13   Letter From Linda Noble to          86
             Victor Brown
             October 4, 2013

Exhibit 14   Letter From Regina Molden to        88
             Linda Noble
             October 7th, 2013

Exhibit 15   Letter From Charles Jones to        90
             Regina Molden
             October 15, 2013

Exhibit 16   Email From Victor Brown            106
             September 20, 2013

(Original Exhibits 1 through 16 have been
attached to the original transcript.)

VICTOR M. BROWN vs.
BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.

VICTOR M. BROWN
August 20, 2014

Page 5

[1]      (Reporter disclosure made pursuant to
[2]  Article 10.B of the Rules and Regulations of the
[3]  Board of Court Reporting of the Judicial Council
[4]  of Georgia.)
[5]      **MR. MCGRAW:** This will be the deposition
[6]  of Dr. Victor Brown in the lawsuit styled Victor
[7]  Brown versus Board of Regents of the University
[8]  System of Georgia, et al.  It is Civil Action
[9]  File No. 1:14-cv-365-WBH-LTW, in the US District
[10]  Court for the Northern District of Georgia.
[11]      The deposition is being conducted pursuant
[12]  to notice and agreement of the parties and is
[13]  being taken for all purposes allowed by law,
[14]  including the federal rules of civil procedure.
[15]      VICTOR M. BROWN,
[16]  having been first duly sworn, was examined and
[17]  testified as follows:
[18]      **EXAMINATION**
[19]  BY MR. MCGRAW:
[20]  **Q.**   Can you state your name for the record,
[21]  please.
[22]  **A.**   Victor Brown.
[23]  **Q.**   And what is your full name?
[24]  **A.**   Victor Martin Demetrius Brown.
[25]  **Q.**   And you're the plaintiff in the lawsuit I

Page 6

[1]  just referred to; is that right?
[2]  **A.**   Yes, I am.
[3]  **Q.**   And you understand the oath you just took
[4]  requires you to give truthful testimony today to the
[5]  best of your ability?
[6]  **A.**   Yes, I do.
[7]  **Q.**   Is there any reason you would not be able
[8]  to give truthful testimony today?
[9]  **A.**   No, there isn't.
[10]  **Q.**   Not on any medication or anything like
[11]  that that would affect your ability to remember or
[12]  answer questions?
[13]  **A.**   No.
[14]  **Q.**   What is your current home address,
[15]  Dr. Brown?
[16]  **A.**
[17]
[18]  **Q.**   How long have you been at that address?
[19]  **A.**   About six months.
[20]  **Q.**   And where were you before that?
[21]  **A.**
[22]  **Q.**   Have you ever given a deposition before?
[23]  **A.**   No, I have not.
[24]  **Q.**   Okay.  I'm sure your lawyer has already
[25]  explained this process to you.  But just to make sure

Page 7

[1]  that we're on the same page, I'll ask you a series of
[2]  questions today.  And as I alluded to earlier, you'll
[3]  answer truthfully to the best of your ability.
[4]      If you don't know the answer to something,
[5]  it's fine to say you don't know.  It's not like an
[6]  exam in school; don't feel like you have to come up
[7]  with an answer.  If you don't know, that's perfectly
[8]  acceptable.  If you don't understand my question, feel
[9]  free to say so.  Don't guess as to what I might be
[10]  asking.  If you don't understand, just say so, and
[11]  I'll try to clarify.
[12]      Try to remember to give a verbal response.
[13]  In normal conversation, people nod and shake their
[14]  heads.  And it will make sense to everyone in the
[15]  room.  But for the court reporter taking down a
[16]  transcript, that makes it harder to get a clear
[17]  transcript if you don't give a verbal response.
[18]      If you need to take a break at any time,
[19]  let me know.  This is not an endurance test.  I may
[20]  ask you to finish either a question that was asked or
[21]  a topic we're on.  But we can take a break whenever
[22]  you need to.
[23]      What did you do to prepare for the
[24]  deposition today?
[25]  **A.**   Just talked to my lawyer.

Page 8

[1]  **Q.**   Okay.  Did you review any documents or
[2]  anything like that?
[3]  **A.**   Yes, I did.
[4]  **Q.**   What documents did you review?
[5]  **A.**   Documents that I sent to her.
[6]  **Q.**   Such as -- what types of things are you
[7]  talking about?
[8]  **A.**   You have to be more specific than that.
[9]  **Q.**   Well, I can't be more specific.  I'm
[10]  asking what documents you looked at.  I don't know
[11]  more specifically what the answer is.
[12]  **A.**   I don't know how to answer that question
[13]  to be honest with you.  Documents vary.
[14]  **Q.**   I'm sorry?
[15]  **A.**   I looked at documents that I sent to her
[16]  for the case.
[17]  **Q.**   Such as -- what's an example?
[18]  **A.**   Such as my EEOC complaint.
[19]  **Q.**   Okay.  Anything else you can think of?
[20]  **A.**   Such as a letter to the president at Fort
[21]  Valley.  Such as the case that was filed.
[22]  **Q.**   The complaint in the lawsuit?
[23]  **A.**   Correct.
[24]  **Q.**   Anything else you can think of?
[25]  **A.**   No.

VICTOR M. BROWN vs.
BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.

VICTOR M. BROWN
August 20, 2014

Page 9

[1]    Q.    Okay. What is your date of birth,
[2]  Dr. Brown?
[3]    A.    ▬▬▬▬▬
[4]    Q.    And where were you born?
[5]    A.    Montego Bay, Jamaica.
[6]    Q.    Are you an American citizen?
[7]    A.    Yes, I am.
[8]    Q.    When did you become an American citizen?
[9]    A.    December 2012.
[10]   Q.    Are you married or have you been married
[11] in your life?
[12]   A.    I've been married.
[13]   Q.    When were you married?
[14]   A.    April 24, 2004.
[15]   Q.    To whom?
[16]   A.    Judith Thompson.
[17]   Q.    I'm sorry?
[18]   A.    Judith Thompson.
[19]   Q.    Jared?
[20]   A.    Judith Thompson.
[21]   Q.    Judith. And how long were you married to
[22] Judith Thompson?
[23]   A.    Six months.
[24]   Q.    And you were divorced at that time?
[25]   A.    Yes, we are divorced.

Page 10

[1]    Q.    Have you ever been married any other time
[2]  besides that?
[3]    A.    No.
[4]    Q.    Where does Judith Thompson live?
[5]    A.    I have no idea.
[6]    Q.    Do you believe she might be in the Atlanta
[7]  area?
[8]         MS. MOLDEN:  Objection. Calls for
[9]       speculation.
[10]   Q.    (By Mr. McGraw)  At the current time, do
[11] you have a partner?
[12]   A.    Can you clarify your question.
[13]   Q.    Do you have a partner with whom you live?
[14]   A.    Yes.
[15]   Q.    And who is that?
[16]   A.    Ryan Davis.
[17]   Q.    And I want to clarify on that subject.
[18] I'm not looking to pry into your life any more than
[19] necessary. But obviously to some extent that became
[20] an issue in the lawsuit, so I'll ask about that to the
[21] extent it relates to the lawsuit. But I'm not looking
[22] to pry into your life any more than need be.
[23]         Tell me the name again.
[24]   A.    Ryan Davis.
[25]   Q.    How long have you lived with Ryan Davis?

Page 11

[1]    A.    Two years, nine months.
[2]    Q.    So that would be back to early 2012, is
[3]  that right, roughly?
[4]    A.    2011, I think. Late 2011, I think.
[5]    Q.    Do you have any children?
[6]    A.    No, I do not.
[7]    Q.    Do you have any family who live in the
[8]  metro Atlanta area?
[9]    A.    No, I do not.
[10]   Q.    Do you have any family who live in
[11] Georgia?
[12]   A.    No, I do not.
[13]   Q.    And, again, I'm not looking to pry into
[14] your personal life any more than need be. But because
[15] it's relevant in the case, you are gay; is that
[16] correct?
[17]   A.    Yes, I am.
[18]   Q.    Okay. Do you consider that an appropriate
[19] way for me to refer to your sexual orientation?
[20]   A.    I don't care.
[21]   Q.    Okay. And I'm not looking to either ask
[22] about anything that's inappropriate or refer to your,
[23] your orientation in an inappropriate way. I'm trying
[24] to make sure I'm speaking of that in a way that's
[25] appropriate to you.

Page 12

[1]         Where did you graduate from high school,
[2]  Dr. Brown?
[3]    A.    Montego Bay, Jamaica.
[4]    Q.    And in your interrogatory responses in
[5]  this case, it indicated, I believe, you have a
[6]  bachelor's degree from the University of the West
[7]  Indies; is that right?
[8]    A.    Yes, that's correct.
[9]    Q.    And it referenced a certificate from the
[10] University of London, Wye College. What was that
[11] certificate?
[12]   A.    Plant pathology and molecular techniques.
[13]   Q.    What does that mean, a certificate? What
[14] did that represent? Is this equivalent to a master's
[15] degree? Or what sort of program is that?
[16]   A.    A certificate is a certificate. I'm not
[17] quite sure how to answer that. University grants the
[18] student certification degrees. It's a certificate
[19] program. So I got a certificate.
[20]   Q.    Is it sort of advanced studies beyond --
[21]   A.    Specialized studies.
[22]   Q.    And then it said you had a PhD from the
[23] University of the West Indies; is that right?
[24]   A.    That is correct.
[25]   Q.    And an MBA from Emory University?

Page 13

[1]   **A.**   Yes, that is correct.
[2]   **Q.**   Do you have any other degrees besides
[3]   those?
[4]   **A.**   No, I do not.
[5]   **Q.**   Have you ever served in the military?
[6]   **A.**   No, I have not.
[7]   **Q.**   Do you belong to any church or religious
[8]   organizations or civic groups, anything like that?
[9]   **A.**   Currently where I'm living, no.  But I
[10]  have belonged to churches.
[11]  **Q.**   Did you in Fort Valley or the Fort Valley
[12]  area?
[13]  **A.**   I visited churches in the Fort Valley
[14]  area.
[15]  **Q.**   None in Atlanta, I assume?
[16]  **A.**   No.
[17]  **Q.**   Have you ever filed for bankruptcy?
[18]  **A.**   No.
[19]  **Q.**   And I understand from your interrogatory
[20]  responses you've never been a party to a lawsuit other
[21]  than this one.  Is that right?
[22]  **A.**   That's correct.
[23]  **Q.**   And other than related to this case,
[24]  you've never filed a charge of discrimination before;
[25]  is that right?

Page 14

[1]   **A.**   No, I have not.
[2]   **Q.**   Other than at Fort Valley State, have you
[3]   ever felt like you were, I guess, unlawfully or
[4]   unfairly discriminated against before?
[5]   **A.**   No, I have not.
[6]   **Q.**   Have you ever been convicted of a crime?
[7]   **A.**   No, I have not.
[8]   **Q.**   I understand you've been arrested twice;
[9]   is that right?
[10]  **A.**   That is correct.
[11]  **Q.**   That was once in Houston County, Georgia;
[12]  right?
[13]  **A.**   That is correct.
[14]  **Q.**   And once in Camden, New Jersey; is that
[15]  right?
[16]  **A.**   Camden County.
[17]  **Q.**   Okay.  And those are the only two times?
[18]  **A.**   That is correct.
[19]  **Q.**   And my understanding is that both of those
[20]  charges have since been expunged; is that right?
[21]  **A.**   That is correct.
[22]  **Q.**   Do you know why they were expunged?
[23]  **A.**   I'm not quite sure what you're asking.
[24]  **Q.**   Were the charges dropped-- or I guess do
[25]  you know why the charges were dropped, may be the

Page 15

[1]   better way to put it?
[2]   **A.**   You're asking me if I know why the charges
[3]   were dropped?  Is that what I'm being asked?
[4]   **Q.**   Yes.
[5]   **A.**   The charges were dropped, one, because one
[6]   was a nonissue, not a case.  The one in Houston
[7]   County.  The other one -- both charges were dropped.
[8]   **Q.**   Do you know why?
[9]   **A.**   I'm not quite sure what you're asking.
[10]  **Q.**   I think it's pretty clear what I'm asking.
[11]  Do you know why they were dropped?  Maybe you do,
[12]  maybe you don't.  I don't see what's unclear about the
[13]  question.
[14]  **A.**   I'm not quite sure what you're asking, and
[15]  I can't answer a question if I'm not sure what you're
[16]  asking me.
[17]  **Q.**   Has anyone ever given you any reason why
[18]  the police or the prosecutors office decided not to
[19]  prosecute the cases?
[20]  **A.**   The letter that I got from Houston County,
[21]  I think it stipulated.  But I cannot recall what's in
[22]  the letter.
[23]  **Q.**   So you don't have any idea why the cases
[24]  were not prosecuted?
[25]  **A.**   I don't recall what's in the letter.

Page 16

[1]   **Q.**   My question is, so you don't have any idea
[2]   why they weren't prosecuted?
[3]   **A.**   I can't recall what is in the letter.
[4]   **Q.**   I know you can't recall what's in the
[5]   letter.  Other than the letter, do you have any idea
[6]   why they were not prosecuted?
[7]       **MS. MOLDEN:** If you don't know, you can
[8]   just say you don't know.
[9]       **THE WITNESS:** I don't know.
[10]  **Q.**   (By Mr. McGraw)  That's all I'm asking.
[11]      In your interrogatory responses, you
[12]  listed a number of employers.  And I don't want to
[13]  belabor those.  But just to see if we have them all,
[14]  that was St. Jude Children's Research Hospital?
[15]  **A.**   That is correct.
[16]  **Q.**   Tuskegee University?
[17]  **A.**   That is correct.
[18]  **Q.**   And Burlington County College?
[19]  **A.**   That is correct.
[20]  **Q.**   Are those the only places you've worked
[21]  since you've gotten out of school except Fort Valley
[22]  State?
[23]      **MS. MOLDEN:** Are you saying up to the time
[24]  that he became employed with Fort Valley State?
[25]      **MR. MCGRAW:** Yes, yes.  Thank you.

VICTOR M. BROWN vs.
BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.

VICTOR M. BROWN
August 20, 2014

Page 17

[1]   Q.   (By Mr. McGraw)  I understand since then
[2]  you now work at TCI College of Technology; is that
[3]  right?
[4]   A.   That is correct.
[5]   Q.   When did you start working there?
[6]   A.   In February.
[7]   Q.   Of 2014?
[8]   A.   Correct.
[9]   Q.   And you're a dean there; is that right?
[10]   A.   That is correct.
[11]   Q.   As I understand from your responses, I
[12]  believe you left St. Jude in September of 2004.  Does
[13]  that sound right?
[14]   A.   Correct.
[15]   Q.   And started at Tuskegee in March of 2005;
[16]  is that right?
[17]   A.   Started Tuskegee September 2004.
[18]   Q.   Okay.  When did you leave Tuskegee?
[19]   A.   November 2010.
[20]   Q.   And then is that when you started
[21]  Burlington County College?
[22]   A.   No.
[23]   Q.   When did you start there?
[24]   A.   September 2011, I think.
[25]   Q.   What did you do between November of '10

Page 18

[1]  and September of '11?
[2]   A.   Volunteered with my church.
[3]   Q.   Why did you leave Tuskegee?
[4]   A.   I wanted to focus more on administration.
[5]   Q.   And so you resigned Tuskegee?
[6]   A.   It was a decision between my dean -- that
[7]  I did not research.  I did not want to teach.  I
[8]  wanted to focus more on administration.
[9]   Q.   So then were you in administration at
[10]  Burlington?
[11]   A.   Yes, I was.
[12]   Q.   What was your job there?
[13]   A.   I was a dean.
[14]   Q.   What were you the dean of?
[15]   A.   Science, math and technology, nurse and
[16]  allied health.
[17]   Q.   What are you the dean of now at TCI?
[18]   A.   Business, legal studies, health science,
[19]  and technologies.
[20]   Q.   And that's in New York City; is that
[21]  right?
[22]   A.   That's correct.
[23]   Q.   Had you ever been terminated from a job
[24]  prior to coming to Fort Valley?
[25]   A.   Prior to coming to Fort Valley, no, I have

Page 19

[1]  not.
[2]   Q.   Have you since then?
[3]   A.   No, I have not.
[4]   Q.   Have you ever filed for unemployment
[5]  benefits?
[6]   A.   Yes, I have.
[7]   Q.   When was that?
[8]   A.   When I left Tuskegee, when I went -- and
[9]  after Fort Valley.
[10]   Q.   Were those benefits granted?
[11]   A.   Yes, they were.
[12]   Q.   In both instances?
[13]   A.   Yes, they were.
[14]   Q.   What is your salary at TCI?
[15]   A.   110.
[16]   Q.   And at Fort Valley it was $115,000 a year;
[17]  is that right?
[18]   A.   That is correct.
[19]   Q.   And it stayed the same the whole time you
[20]  were at Fort Valley, your salary?
[21]   A.   You have to clarify.
[22]   Q.   I'll ask a better question.  Was your
[23]  salary $115,000 per year the whole time you were at
[24]  Fort Valley State, or did it change at any point?
[25]   A.   I'm not sure how to answer the question.

Page 20

[1]  Because --
[2]   Q.   I understand.  I take that question back.
[3]  I understand it's actually a bad question.
[4]        During the time that you were dean, your
[5]  salary was 115,000 the whole time; right?
[6]   A.   During the time I was a dean.
[7]   Q.   And then after that it changed?
[8]   A.   After Fort Valley changed it without my
[9]  permission.
[10]        MS. MOLDEN:  Just answer his question.
[11]   Q.   (By Mr. McGraw)  For purposes of your
[12]  career and whatever your career aspirations may be, is
[13]  being at TCI any better or worse than being at Fort
[14]  Valley State?
[15]   A.   I'm not quite sure what you're asking.
[16]   Q.   I guess I'm wondering do you consider --
[17]  putting all other salary and so forth issues aside.
[18]  Just from an academic career standpoint, are you any
[19]  worse off being at TCI than you would be being at Fort
[20]  Valley State?
[21]   A.   That's not a question I can answer at this
[22]  point in time.
[23]   Q.   Why is that?
[24]   A.   I just started at TCI.  I don't know at
[25]  this point.

VICTOR M. BROWN vs.
BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.

VICTOR M. BROWN
August 20, 2014

Page 21

[1]   **Q.**   So you don't know at this point?
[2]   **A.**   No.
[3]   **Q.**   Okay. You became employed at Fort Valley
[4]   State in April of 2014; is that right?
[5]   **A.**   That is correct.
[6]   **Q.**   And you were hired as the dean of the
[7]   college of arts and sciences?
[8]   **A.**   That is correct.
[9]   **Q.**   How did you first hear about that
[10]   position, that there was an opening there?
[11]   **A.**   Well, two way. It was advertised, and I
[12]   was told about it by an employee there.
[13]   **Q.**   Where was it advertised that you saw?
[14]   **A.**   Chronicle of Higher Education.
[15]   **Q.**   Who was the employee that told you about
[16]   it?
[17]   **A.**   I talked to Danielle Gray-Singh.
[18]   **Q.**   You had worked with her previously; is
[19]   that right?
[20]   **A.**   That is correct.
[21]   **Q.**   Where was that?
[22]   **A.**   Tuskegee University.
[23]   **Q.**   What was her position at Tuskegee?
[24]   **A.**   I think she was an associate professor of
[25]   biology.

Page 22

[1]   **Q.**   How did you decide that Fort Valley State
[2]   was a position you'd be interested in applying for?
[3]   **A.**   Fort Valley was a four-year institution,
[4]   and I wanted to get back in to a four-year
[5]   institution.
[6]   **Q.**   And Burlington was a two-year institution?
[7]   **A.**   That is correct.
[8]   **Q.**   So what did you do then? Did you just
[9]   submit a written application? What was your first
[10]   contact with Fort Valley?
[11]   **A.**   Applied for the job.
[12]   **Q.**   By mailing in or submitting an application
[13]   online?
[14]   **A.**   Online application.
[15]   **Q.**   Okay. And then when did you hear back
[16]   from Fort Valley State?
[17]   **A.**   I did not hear from Fort Valley State.
[18]   **Q.**   What was the next thing you heard about
[19]   the position after you applied?
[20]   **A.**   I was contacted by the company they used.
[21]   **Q.**   Outside search firm?
[22]   **A.**   Yes, sir.
[23]   **Q.**   Who was that?
[24]   **A.**   Myers-Mcrae.
[25]   **Q.**   And what was the nature of your contact

Page 23

[1]   from them?
[2]   **A.**   What do you mean what was the nature of my
[3]   contact from them?
[4]   **Q.**   Did they invite you for an interview? Or
[5]   did they just call to speak to you generally about the
[6]   job? What happened next?
[7]   **A.**   They had a phone interview.
[8]   **Q.**   Okay. And then what happened next after
[9]   that?
[10]   **A.**   Months later, they asked if I wanted to
[11]   come in for a person-to-person interview.
[12]   **Q.**   Do you remember who you interviewed with
[13]   over the phone with the search firm?
[14]   **A.**   I cannot recall.
[15]   **Q.**   And you said they asked you to come in for
[16]   a person-to-person interview. Was that also with the
[17]   search firm?
[18]   **A.**   The person-to-person interview was at Fort
[19]   Valley.
[20]   **Q.**   Okay. With Fort Valley employees?
[21]   **A.**   That is correct.
[22]   **Q.**   Okay. With whom did you interview at Fort
[23]   Valley?
[24]   **A.**   Dr. Canter Brown. It was several persons.
[25]   **Q.**   Who else do you remember besides Canter

Page 24

[1]   Brown?
[2]   **A.**   Canter brown, Danielle Gray-Singh, Melody
[3]   Carter. What's his name? Edward Hill. What's her
[4]   name? Megan Fields. There were several people there.
[5]   The entire search -- Pitts was there, Dr. Pitts. The
[6]   entire search committee and several people. If you
[7]   ask me, I'm going to give an entire Fort Valley list.
[8]   **Q.**   When you interviewed with these people on
[9]   the search committee, was it with all them at once, or
[10]   was it with different -- smaller interviews?
[11]   **A.**   Combination.
[12]   **Q.**   So what then happened after those
[13]   interviews?
[14]   **A.**   I waited.
[15]   **Q.**   And what happened next after you waited?
[16]   What did you hear from Fort Valley State?
[17]   **A.**   I didn't hear from Fort Valley State. I
[18]   heard from the search firm.
[19]   **Q.**   Okay. What did you hear from the search
[20]   firm?
[21]   **A.**   That they liked my interview, that they
[22]   liked me. They were waiting on my background check.
[23]   They're waiting on my credential verification.
[24]   **Q.**   Okay. And then what was the next thing
[25]   you heard either from Fort Valley or the research

VICTOR M. BROWN vs.
BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.

VICTOR M. BROWN
August 20, 2014

Page 25

[1] firm?

[2] **A.** That they had a problem with my background
[3] check. They had a hit on my background check.

[4] **Q.** What was that?

[5] **A.** That I was arrested.

[6] **Q.** And that was the Camden County, New
[7] Jersey, arrest?

[8] **A.** That is correct.

[9] **Q.** So what did they tell you? Did they ask
[10] you for more information? What was supposed to happen
[11] next?

[12] **MS. MOLDEN:** I'm going to object to the
[13] form, "they told you."

[14] **Q.** (By Mr. McGraw) Whoever you spoke with at
[15] the search firm, what did they tell you would be next
[16] in the process then?

[17] **A.** That I should wait to hear from Fort
[18] Valley.

[19] **Q.** And then did you hear from Fort Valley?

[20] **A.** I did.

[21] **Q.** Who did you hear from?

[22] **A.** Dr. Canter Brown.

[23] **Q.** What did he have to say?

[24] **A.** He wanted -- he asked for an explanation
[25] as to what happened.

Page 26

[1] **Q.** And what did you tell him?

[2] **A.** My lawyer told him that the case was
[3] getting ready to be dismissed and expunged.

[4] **Q.** So you directed your lawyer to speak with
[5] Canter Brown?

[6] **A.** We both spoke to Canter Brown.

[7] **Q.** And who was your lawyer?

[8] **A.** What was his name? I left his information
[9] in my car.

[10] **Q.** He was in New Jersey?

[11] **A.** Correct.

[12] **Q.** What was the next step in the process
[13] after that?

[14] **A.** I was asked to explain what happened. My
[15] partner was asked the same, confidential letter to
[16] explain what happened.

[17] **Q.** Okay. And what explanation did you give?

[18] **A.** We had a glass of wine. When we had a
[19] glass of wine, we started to argue. One thing led to
[20] another. We pushed each other. The police came in.
[21] I was arrested.

[22] The case was dismissed because -- neither
[23] of us had guessed -- when we explained to the judge
[24] what had happened, the DA, she decided to dismiss the
[25] case.

Page 27

[1] **Q.** Who called the police?

[2] **A.** We both did.

[3] **Q.** And you gave that explanation to Canter
[4] Brown; is that right?

[5] **A.** And we both sent him letters. Yes.

[6] **Q.** Okay. And so what happened next?

[7] **A.** What do you mean what happened next?

[8] **Q.** What was the next thing you heard from
[9] Fort Valley State or the search firm?

[10] **A.** I was told the content of that letter
[11] would be kept confidential, with only the president,
[12] legal counsel, and HR. One, he told me that once the
[13] case is dismissed, then we'll move forward with my
[14] application.

[15] **Q.** Who said that?

[16] **A.** Canter Brown.

[17] **Q.** And then what happened next in the
[18] process?

[19] **A.** The case was dismissed and expunged.

[20] **Q.** As far as the application process at Fort
[21] Valley, what happened next?

[22] **A.** Once it was expunged, I was sent -- I sent
[23] him a letter -- he sent me an offer letter for the
[24] position.

[25] **Q.** Did Canter Brown say he was satisfied with

Page 28

[1] the explanation you gave him about the arrest?

[2] **A.** He was satisfied. And I was told its
[3] contents would be kept confidential.

[4] **Q.** And you said next he sent you an offer
[5] letter; is that right?

[6] **A.** Correct.

[7] **Q.** Before he sent you the offer letter, did
[8] he make an offer to you verbally?

[9] **A.** I was told that, based on the -- what
[10] happened with the case, I would be offered a position.

[11] **Q.** Did you discuss the terms of the position?

[12] **A.** I did.

[13] **Q.** What were the terms that you discussed?

[14] **A.** $115,000 plus tenure when I got to Fort
[15] Valley.

[16] **Q.** And what did Canter Brown say about that?

[17] **A.** When I get to Fort Valley, the president
[18] has authority to grant tenure, as he's done in the
[19] past, on his authority as a president. I would get
[20] tenure when I get there. In the department of
[21] biology -- because that's where my background -- my
[22] background. And that I would be offered $115,000 per
[23] year.

[24] **Q.** Anything else?

[25] **A.** No.

VICTOR M. BROWN vs.
BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.

VICTOR M. BROWN
August 20, 2014

Page 29

[1]   Q.   Are you aware of what recommendations the
[2]  search committee made after the interviews?
[3]   A.   You have to be a bit more specific.
[4]   Q.   You said you interviewed with the search
[5]  committee, and then later you were dealing with Canter
[6]  Brown.  Do you know anything about the process in
[7]  between of what recommendations the search committee
[8]  made?
[9]   A.   Are you asking me what I was told by
[10]  people on the search committee?  Is that what you're
[11]  referring to?
[12]   Q.   Sure.  And anything you may know about it.
[13]   A.   I was told that some search committee
[14]  member wanted me -- some wanted -- Dr. Davis was
[15]  another contestant.  I was told there's some person on
[16]  the search committee who had a problem with me being
[17]  gay and did not want me at Fort Valley, if that's what
[18]  you're referring to.
[19]   Q.   Who told you that?
[20]   A.   I was told that by Dr. Edward Hill.
[21]   Q.   And did he say who the person was who
[22]  didn't want you?
[23]   A.   Dr. Danielle Gray-Singh had a problem
[24]  when they found out I was gay.  So did Dr. Melody
[25]  Carter.

Page 30

[1]   Q.   That's what Dr. Hill told you?
[2]   A.   That is correct.
[3]   Q.   And you had worked with Dr. Gray-Singh
[4]  before; correct?
[5]   A.   She did not know I was gay.
[6]   Q.   Okay.  How did she find out you were gay?
[7]   A.   The letter that I sent.  That's how Fort
[8]  Valley found out.  Nobody knew I was gay before then.
[9]   Q.   How did you know that that's how
[10]  Dr. Gray-Singh found out?
[11]   A.   Nobody knew I was gay before that.  It was
[12]  through the letter.
[13]   Q.   I understand that's your position.  But
[14]  let me ask you this.  Do you have any direct knowledge
[15]  of how Dr. Gray-Singh found out that you were gay?
[16]   A.   The letter that was sent.
[17]   Q.   How do you know it was the letter that was
[18]  sent?
[19]   A.   Because before that, it never came up with
[20]  her.  It never came up with anybody.  It was the
[21]  letter that was sent.
[22]   Q.   Has anyone ever told you that that's how
[23]  she found out?
[24]   A.   I was told that when the letter came that
[25]  some people started to act differently.  That's what

Page 31

[1]  Dr. Hill told me.
[2]   Q.   And Dr. Hill is the dean of the college of
[3]  education; is that right?
[4]   A.   That is correct.
[5]   Q.   And was he the head of the search
[6]  committee?
[7]   A.   Yes, he was.
[8]        (Recess from 10:32 a.m. to 10:34 a.m.)
[9]        (Defendants' Exhibit 1 was marked for
[10]  identification.)
[11]   Q.   (By Mr. McGraw)  Dr. Brown, we're back on
[12]  the record.  Take a look at what's been marked
[13]  Exhibit 1, and tell me if you recognize that document,
[14]  please.
[15]   A.   Yes, I do.
[16]   Q.   What is that?
[17]   A.   The offer letter.
[18]   Q.   This is the letter you received from
[19]  Canter Brown?
[20]   A.   Correct.
[21]   Q.   Okay.  Is this the only offer letter that
[22]  you received for that position?
[23]   A.   Yes, it is.
[24]   Q.   And this letter doesn't make any mention
[25]  of tenure, does it?

Page 32

[1]   A.   No, it doesn't.  But we spoke about it,
[2]  that when I got there -- when I got there, we would
[3]  discuss it.  Because the president has the authority
[4]  to grant tenure.  The president has granted tenure to
[5]  several other senior administrators at Fort Valley
[6]  State.
[7]   Q.   Do you know who made the final decision to
[8]  hire you as dean?
[9]   A.   The final decision?
[10]   Q.   Yes.
[11]   A.   Came from?
[12]        MS. MOLDEN: If you know.  I'm sorry.  Go
[13]  ahead.
[14]   Q.   (By Mr. McGraw)  I'm asking if you know.
[15]  You may or may not.
[16]   A.   I can speculate.
[17]   Q.   Duly noted that it's just speculation, but
[18]  what is your belief as to who it was?
[19]   A.   I would assume to the person I report to,
[20]  which is Dr. Brown.
[21]   Q.   Okay.  He was your direct supervisor?
[22]   A.   That is correct.
[23]   Q.   Okay.  His position was executive vice
[24]  president and interim vice president for academic
[25]  affairs; is that right?

Page 33

[1]    **A.**    That is correct.

[2]    **Q.**    Did all of the deans report to him?

[3]    **A.**    That is correct.  It was in that position

[4]  that he told me that I would be granted tenure when I

[5]  got to Fort Valley.

[6]    **Q.**    What do you mean it was in that position?

[7]    **A.**    As my supervisor -- he wanted a reason for

[8]  me to make that trek from where I was to Fort Valley.

[9]        (Defendants' Exhibit 2 was marked for

[10]  identification.)

[11]    **Q.**    (By Mr. McGraw)  Okay.  Take a look at

[12]  Exhibit 2, please, and tell me if you recognize that.

[13]    **A.**    Yes, I do.

[14]    **Q.**    What is that?

[15]    **A.**    My acceptance letter.

[16]    **Q.**    Okay.  This is your response to Exhibit 1

[17]  that we just looked at; right?

[18]    **A.**    That is correct.

[19]    **Q.**    And this also doesn't mention tenure, does

[20]  it?

[21]    **A.**    No, it doesn't.

[22]        (Defendants' Exhibit 3 was marked for

[23]  identification.)

[24]    **Q.**    (By Mr. McGraw)  Take a look at Exhibit 3,

[25]  please, and tell me if you recognize that one.

Page 34

[1]    **A.**    Yes, I do.

[2]    **Q.**    What is that?

[3]    **A.**    Dr. Brown's response to my acceptance

[4]  letter.

[5]    **Q.**    And I guess you were originally going to

[6]  start April 1st, and you agreed you would start

[7]  April 15th instead; is that right?

[8]    **A.**    That is correct.

[9]    **Q.**    Did you in fact start on April 15th?

[10]    **A.**    Yes, I did.

[11]    **Q.**    If you go back to Exhibit 1 for a minute,

[12]  please.  I'm sorry.  Do you see in the second

[13]  paragraph the last sentence reads, "I also call your

[14]  attention to the fact that the policies of the Board

[15]  of Regents provide that administrative officers are

[16]  appointed by the president and hold office at the

[17]  pleasure of the president."

[18]        Do you remember seeing that in the letter?

[19]    **A.**    I do.

[20]    **Q.**    What did they mean to you?

[21]    **A.**    Just what it says.

[22]    **Q.**    Okay.  You said earlier that -- I guess in

[23]  the course of the hiring process, Dr. Hill told you

[24]  that some others on the search committee had a problem

[25]  with your being gay.  During that time before you

Page 35

[1]  were -- before you started as dean, did anyone else

[2]  ever say anything to you about being gay?

[3]    **A.**    Can you repeat the question.

[4]    **Q.**    I'll start over.  During the hiring

[5]  process, before you became dean, did anybody

[6]  associated with Fort Valley State ever say anything to

[7]  you about being gay other than what you mentioned

[8]  earlier from Dr. Hill?

[9]    **A.**    No.

[10]    **Q.**    And you said earlier that he said it was

[11]  Dr. Gray-Singh and Dr. Carter, Melody Carter, who had

[12]  a problem with that?

[13]    **A.**    Those are the two names that I can recall.

[14]    **Q.**    Okay.  Have you told me everything you can

[15]  remember about your conversations with Canter Brown

[16]  before you started work as dean?

[17]    **A.**    What aspect of conversation are you

[18]  referring to?

[19]    **Q.**    Mainly regarding any negotiations or terms

[20]  about your position --

[21]    **A.**    Two things that were clear.  One, my

[22]  salary.  Two, that I would be granted tenure once I

[23]  got there, because I had all the qualifications for

[24]  tenure.

[25]    **Q.**    And I think you said the president had the

Page 36

[1]  authority to grant you tenure there?

[2]    **A.**    That was part of the conversation.

[3]    **Q.**    In your interrogatory responses, you also

[4]  said that on May 20th -- it says Dr. William Hill

[5]  informed you that Danielle Gray-Singh was trying to

[6]  have you terminated because of your sexual

[7]  orientation.

[8]        First off, when it says Dr. William Hill,

[9]  is that Edward Hill?

[10]    **A.**    (Witness nods.)

[11]    **Q.**    Do you recall that statement that I just

[12]  referred to?

[13]    **A.**    Yes, I do.

[14]    **Q.**    Is that the same as the statement you said

[15]  earlier about Carter and Gray-Singh's concerns, or did

[16]  Dr. Hill tell this to you separately?

[17]    **A.**    I'm not quite sure what you're asking.

[18]    **Q.**    I think that's fair.

[19]        You said earlier that at some point

[20]  Dr. Hill told you that Melody Carter and Danielle

[21]  Gray-Singh did not want you at Fort Valley because you

[22]  were gay; right?

[23]    **A.**    That is correct.

[24]    **Q.**    In your interrogatory responses, it says

[25]  that on May 20th he told you that Gray-Singh was

VICTOR M. BROWN vs.
BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.

VICTOR M. BROWN
August 20, 2014

Page 37

[1] trying to have your terminated because of your sexual
[2] orientation.  Are those two different conversations?
[3]      A.     On what?
[4]      Q.     May 20th, 2013.
[5]             Are those two different conversations, or
[6] are we talking about the same thing?
[7]      A.     Those are two different conversations.
[8]      Q.     Okay.  What happened in this second
[9] conversation with Dr. Hill?
[10]     A.     What do you mean what happened?
[11]     Q.     What did he tell you?
[12]     A.     I'm not sure what you're asking.
[13]     Q.     I'm asking you, what did he tell you?
[14]     A.     Just what you read, that Daniel Gray-Singh
[15] had a problem with me being gay.  She wanted to have
[16] me removed from Fort Valley.
[17]     Q.     How did that come up?  Did he come to you
[18] just to tell you that?  Or were you having a
[19] conversation about something else and it just came up?
[20] What was the context of that?
[21]     A.     Being the new dean, he was giving me
[22] advice to be cautious, to be careful, because people
[23] had problems with my sexual orientation.
[24]     Q.     Was this an in-person meeting?  When he
[25] said this to you, was this on the phone or in person?

Page 38

[1]      A.     In-person conversation.
[2]      Q.     Did he mention anyone other than
[3] Dr. Gray-Singh?
[4]      A.     There were other things, but he never
[5] mentioned it to me.  Some things he would tell me,
[6] some things he wouldn't.  I don't know the extent of
[7] what he knows.
[8]      Q.     Right.  But I'm just asking, in this
[9] conversation did he mention anyone other than
[10] Dr. Gray-Singh?
[11]     A.     That's -- not to my knowledge.
[12]     Q.     Okay.  You started on April 15th?
[13]     A.     Correct.
[14]     Q.     And sometime after that you were notified
[15] that you were being awarded tenure; is that right?
[16]     A.     Rephrase that question.
[17]     Q.     At some point in time while you were on
[18] campus as dean.  You were notified that you were being
[19] awarded tenure; is that right?
[20]     A.     No.  I negotiated tenure before I got
[21] there.  Because I wasn't notified when I got there.  I
[22] just want to make that absolutely clear.
[23]            (Defendant's Exhibit 4 was marked for
[24]     identification.)
[25]     Q.     (By Mr. McGraw)  Take a look at Exhibit 4,

Page 39

[1] please, tell me if you recognize that.
[2]      A.     Yes, I do.
[3]      Q.     What is that?
[4]      A.     The letter confirming the fact that I was
[5] awarded tenure at the level of associate professor.
[6]      Q.     And this is a letter you got from Larry
[7] Rivers, who was the president then; right?
[8]      A.     That is correct.
[9]      Q.     And it's dated May 30, 2013, right?
[10]     A.     Correct.
[11]     Q.     And says, "this comes to notify you that
[12] your" -- he is awarding you academic rank of associate
[13] professor biology with tenure effective immediately";
[14] is that right?
[15]     A.     Correct.
[16]     Q.     It also says it's on the recommendation of
[17] Danielle Gray-Singh; right?
[18]     A.     That's what the letter says.
[19]     Q.     Do you have reason to believe that that's
[20] not true?
[21]     A.     What are you asking?
[22]     Q.     Well, your answer, that's what the letter
[23] says, gave the impression that perhaps you didn't
[24] believe that Danielle Gray-Singh had --
[25]     A.     Danielle Gray-Singh was following the

Page 40

[1] directive of Canter Brown, her boss.
[2]      Q.     How do you know that?
[3]      A.     Because Dr. Brown told me.
[4]      Q.     He told you what?
[5]      A.     He asked Danielle to look at my resumé, my
[6] curriculum vitae, which includes my publications,
[7] presentations.  And based on that, to make a
[8] recommendation as to what tenure -- to what rank I
[9] should offer tenure at.
[10]     Q.     How do you know that?
[11]     A.     Because he told me.
[12]     Q.     Dr. Brown did?
[13]     A.     Yes, he did.  Because he wanted to know --
[14] because when you're offered tenure, you have to be
[15] offered a rank.  And so he wanted Dr. Gray-Singh to
[16] take a look at my curriculum vitae to see at what
[17] rank; was it assistant professor or associate
[18] professor awarded tenure at.
[19]     Q.     And associate professor is a higher
[20] position than assistant professor; right?
[21]     A.     That is correct.
[22]     Q.     And at some point in time you were
[23] notified that you would not have tenure after all; is
[24] that right?
[25]     A.     That is correct.

Page 41

[1]   Q.   When was the first that you heard of that?

[2]   A.   This was after Kimberly Ballard Washington

[3] came as interim president.  Dr. Brown said that

[4] Kimberly Ballard Washington told him that Dr. Rivers

[5] didn't have the authority the offer anyone tenure.

[6]   Q.   Okay.  So Canter Brown was the first

[7] person who told you about that?

[8]   A.   Correct.

[9]   Q.   Did he say anything else about it?

[10]   A.   He said he found it strange, because

[11] within the USG system, presidents have the authority

[12] to offer tenure and that Larry Rivers was a president,

[13] and he still had the authority while he was president

[14] to offer tenure.

[15]   Q.   Just so we're clear for the record, USG is

[16] the Georgia University System of Georgia?

[17]   A.   Of Georgia, correct.

[18]   Q.   Did you ever have a conversation with

[19] Kimberly Ballard Washington about that?

[20]   A.   Yes.  We did after Canter Brown sent me a

[21] letter that he was asked to send me by Kimberly

[22] Ballard Washington.

[23]   Q.   Okay.  And tell me what happened in your

[24] conversation with Ms. Ballard Washington.

[25]   A.   She wanted to meet with me to explain to

Page 42

[1] me why my tenure was removed.

[2]   Q.   What did she say?

[3]   A.   Larry Rivers didn't have the authority to

[4] do so.

[5]   Q.   Did she say why?

[6]   A.   Because Larry Rivers was -- based on her

[7] explanation, from what I understood, presidents --

[8] it's either -- I don't want to misquote.  So I don't

[9] remember.

[10]   Q.   Okay.  You're not sure exactly what she

[11] told you?

[12]   A.   I don't remember the reason why she said

[13] Larry Rivers didn't have the authority to grant it.  I

[14] don't want to misspeak.

[15]       (Defendants' Exhibit 5 was marked for

[16]       identification.)

[17]   Q.   (By Mr. McGraw)  Okay.  Take a look at

[18] Exhibit No. 5, please, tell me if you recognize that.

[19]   A.   Yes, I do.

[20]   Q.   What is that?

[21]   A.   The retraction of my tenure offer.

[22]   Q.   And this is the letter you referred to a

[23] minute ago?

[24]   A.   Correct.

[25]   Q.   So this is notifying that you will not

Page 43

[1] have tenure -- it's notifying you won't have tenure.

[2] What is the affect of this on your rank?  Do you know?

[3]   A.   Actually, I'm not sure what you're asking

[4] me.

[5]   Q.   Okay.  Is the result of this that you

[6] would, going forward, be an assistant professor rather

[7] than associate professor?

[8]   A.   No.  It means that both rank and tenure

[9] has been removed.

[10]   Q.   Right.  So what would your title be going

[11] forward?

[12]   A.   Dean.

[13]   Q.   Okay.  So you would not have an academic

[14] rank such as assistant professor?

[15]   A.   That is correct.

[16]   Q.   Okay.  You just wouldn't have a faculty

[17] rank at all?

[18]   A.   That is correct.

[19]   Q.   You mentioned a conversation with Kimberly

[20] Ballard Washington.  Was that the only conversation

[21] you had with her about this issue?

[22]   A.   That is correct.

[23]   Q.   Did you ever speak to Linda Noble about

[24] it?

[25]   A.   Yes, Linda and I spoke about it.

Page 44

[1]   Q.   I'm sorry?

[2]   A.   Yes, Linda and I spoke.

[3]   Q.   When was that?

[4]   A.   Probably a few days after I spoke to

[5] Kimberly.

[6]   Q.   What do you remember of what Dr. Noble

[7] told you?

[8]   A.   She said, based on her -- based on her

[9] experience and knowledge, presidents do not have the

[10] authority to grant rank and tenure.

[11]   Q.   Okay.  Do you know who made this decision

[12] to vacate your tenure?

[13]   A.   Are you asking me to speculate?

[14]   Q.   Well, I guess, first of all, do you

[15] actually know?

[16]   A.   Based on what I was told by Canter Brown,

[17] he was told by Kimberly Ballard Washington.

[18]   Q.   Okay.  So your understanding is that she

[19] made the decision?

[20]   A.   Right, she made the decision.  And Larry

[21] and Canter Brown, as her -- Canter Brown followed

[22] what -- her directives.

[23]   Q.   Did you have any other conversations with

[24] anybody else in the Fort Valley State administration

[25] about this?

VICTOR M. BROWN vs.
BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.

VICTOR M. BROWN
August 20, 2014

Page 45

[1]    **A.**    I basically spoke to my colleagues to try
[2]  to figure out what was going on and what was my best
[3]  course of action.
[4]    **Q.**    But no one else in the management told you
[5]  any more about why this was done or anything like
[6]  that?
[7]    **A.**    No.
[8]    **Q.**    At this point Kimberly Ballard Washington
[9]  was the interim president?
[10]   **A.**    Correct.
[11]   **Q.**    So Ivelaw Griffith was not there yet?
[12]   **A.**    No, he wasn't.
[13]   **Q.**    Do you have any reason to believe that
[14] Edward Hill would have been involved in this decision?
[15]   **A.**    You're asking me to speculate, and I do
[16] not want to speculate.
[17]   **Q.**    So you don't know?
[18]   **A.**    You're asking me to speculate, and I don't
[19] want to speculate.
[20]   **Q.**    I understand.  So what you're saying is
[21] you do not have specific knowledge; anything you can
[22] say would just be speculation?
[23]   **A.**    If you're asking me if Edward had a part
[24] in them removing my tenure, again, my response is I do
[25] not -- I do not want to speculate.

Page 46

[1]    **Q.**    Okay.  And then would Tricia Addison have
[2]  been involved in that to your knowledge?
[3]    **A.**    My response would be the same.
[4]    **Q.**    You don't know?
[5]    **A.**    I'm not going to speculate.  I don't have
[6]  no idea.
[7]    **Q.**    Okay.  My understanding of your lawsuit is
[8]  that you believe that this decision to vacate your
[9]  tenure was discriminatory.  Was that right?
[10]   **A.**    Yes, it was.
[11]   **Q.**    So that I understand what we're talking
[12] about.  I believe your claim is that you feel it was
[13] discriminatory based on your sexual orientation; is
[14] that right?
[15]   **A.**    I believe it's discriminatory based on the
[16] fact that the president at Fort Valley has offered
[17] other people rank and tenure.  The president of other
[18] UGSA systems has offered administratives rank and
[19] tenure, and they still have theirs.
[20]   **Q.**    I understand.  What I'm trying to make
[21] sure, so we're talking about the same thing today.
[22] And I know you're not a lawyer.  I'm not asking you to
[23] articulate legal claims.  But do you believe that this
[24] decision was discriminatory based on your sexual
[25] orientation?

Page 47

[1]    **MS. MOLDEN:**  And I'm going to object to
[2]  the form because it does call for a legal
[3]  conclusion.  You can try to answer.
[4]    **THE WITNESS:**  If you ask me what I
[5]  believe, I believe two things.  One, people tried
[6]  to get rid of me because I'm gay.  That could be
[7]  the way that it was a part of the strategy.
[8]    Two, like I said, there are other people
[9]  with rank and tenure within the USGA system,
[10] including Fort Valley, that was offered by the
[11] president, and they still have theirs.
[12]   **Q.**    (By Mr. McGraw)  I don't mean it in any
[13] way to trick questions.  I'm just trying to make
[14] sure we understand what we're talking about in the
[15] lawsuit.
[16]   Are you contenting that this is
[17] discriminatory just based on the fact that you're a
[18] man?
[19]   **MS. MOLDEN:**  Object.  Again I'm going to
[20] object because it calls for a legal conclusion.
[21]   **Q.**    (By Mr. McGraw)  You can still answer to
[22] the best of your ability.  Her objection is noted.
[23]   **A.**    I don't know how you expect me to answer
[24] the question.
[25]   **Q.**    I'm going to be honest with you.  It seems

Page 48

[1]  like it's a pretty clear question to me.  You've
[2]  brought a lawsuit against the board Board of Regents
[3]  and several individuals.  And all I'm trying to find
[4]  out is what it is that you think they did wrong.  I'm
[5]  not asking for, you know, legal jargon or that.
[6]    What is it that you feel -- why is it
[7]  discriminatory to you?  What basis were they
[8]  discriminating against you?
[9]    **A.**    Again, I'm not going to answer that
[10] question because I don't really know what you're
[11] asking.  If I don't know what you're really asking, no
[12] matter which way you put it, my response is going to
[13] be the same.
[14]   **Q.**    So your response is you can't tell me on
[15] what basis you feel like they discriminated against
[16] you?
[17]   **A.**    You're asking me to give a legal
[18] conclusion, which I'm not qualified to do.  So again
[19] it goes back to my original response.
[20]   **Q.**    Okay.  Well, we disagree about what I'm
[21] asking you to make a legal conclusion.  I'm basically
[22] just asking you to tell me why we're here.
[23]   **A.**    And I've responded to your question, sir.
[24]   **Q.**    Okay.  So your position is you can't tell
[25] me why you've brought this lawsuit?

VICTOR M. BROWN vs.
BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.

VICTOR M. BROWN
August 20, 2014

Page 49

[1]      **A.**     You're asking me two different questions.
[2]  You're asking me why do I think my tenure was taken or
[3]  you're asking me why I'm bringing a lawsuit.  I'm not
[4]  quite sure what I'm being asked.  You're confusing me.
[5]      **Q.**     Then listen, please.  What I'm asking you
[6]  is you have sued my clients.  You have sued them and
[7]  said that it was -- they treated you with
[8]  discrimination in some way.  What I'm trying to find
[9]  out is what characteristic of yours do you believe
[10]  they discriminated against you about?
[11]      **A.**     What aspect of the lawsuit are you
[12]  referring to?  The lawsuit has several aspects.  You
[13]  have to be more specific as to what aspect of my
[14]  lawsuit you're referring to.
[15]      **Q.**     I think I'm being very specific.  You've
[16]  brought a claim for discrimination.  What is it you
[17]  think they're discriminating against you for?  Is it
[18]  because you're a man?  Is it because you're gay?  Is
[19]  it because you're African-American?  Is it because
[20]  you're from Jamaica?  That's what I'm trying to find
[21]  out.  It's a pretty simple question.
[22]      **MS. MOLDEN:** I'll object to the form.
[23]  Calls for a legal conclusion.  But you can try.
[24]      **THE WITNESS:** I don't know how to respond
[25]  to your question.  Because I'm not quite sure

Page 50

[1]  what part of my lawsuit you're referring to.  I
[2]  can't respond to a question I don't understand.
[3]      **Q.**     (By Mr. McGraw)  I will say on the record
[4]  I find it astounding that you're telling me that you
[5]  have no idea what I'm talking about.
[6]      And you remember you're under oath today?
[7]      **A.**     I know I'm under oath.  As I said, I don't
[8]  have a problem answering your question.  And I've been
[9]  answering truthfully.  But I cannot answer questions I
[10]  don't fully understand.
[11]      **MS. MOLDEN:** And I'll ask for a break when
[12]  you come to a point.  Putting it on the table
[13]  that I'd like a break.
[14]      **MR. MCGRAW:** He's not answering my
[15]  question.  This will be a fine time to take a
[16]  break.
[17]      (Recess from 10:57 a.m. to 11:06 a.m.)
[18]      **Q.**     (By Mr. McGraw)  Dr. Brown, I don't want
[19]  to belabor this.  I just have a few more questions on
[20]  this topic, and we'll move on.
[21]      Do you believe that the decision to vacate
[22]  your tenure was based on your sexual orientation?
[23]      **A.**     I do believe that the decision to vacate
[24]  my tenure is linked to the fact that I'm male who
[25]  happens to be in a relationship with another male.

Page 51

[1]      And much of what has transpired occurred
[2]  after I sent to the president a letter outlining that
[3]  I felt as though my rights under Title VII have been
[4]  trampled.  Shortly after that, I was placed on
[5]  administrative leave -- either after or before.  And
[6]  then I was told that my contract would not be renewed,
[7]  and I was told that I was being demoted, which was not
[8]  what my immediate supervisor told me prior to all of
[9]  that.  So I do think it is linked.
[10]      **Q.**     Okay.  Do you believe that the decision to
[11]  vacate your tenure was based on merely the fact that
[12]  you are a man, separate from your sexual orientation?
[13]      **A.**     I can't see the difference between that
[14]  and the question you asked before.  Is there a
[15]  difference between the two?
[16]      **Q.**     There's intended to be.  The difference
[17]  I'm getting at -- I guess put it this way.  Do you
[18]  believe that your tenure would have been vacated had
[19]  Fort Valley State not found out that you were gay?
[20]      **A.**     Would my tenure not been vacated if they
[21]  didn't find out I was gay?
[22]      **Q.**     Yes.
[23]      **A.**     Again, I would have to go back to say that
[24]  I think part of the reason is it's linked to the fact
[25]  my -- I'm a guy who is in a relationship with another

Page 52

[1]  guy.
[2]      **Q.**     Are you finished with your answer?  It's
[3]  fine if you aren't.  I don't want to cut you off.
[4]      **A.**     No, I'm just thinking.  Sometimes I pause
[5]  when I think.
[6]      **Q.**     That's fine.
[7]      **A.**     And also I think a lot of what has
[8]  transpired, in my opinion, is as a retaliation that I
[9]  let Fort Valley know that my rights were being
[10]  trampled under Title VII.
[11]      **Q.**     But that was the retaliation part.  That
[12]  was after this tenure issue; right?
[13]      **A.**     What was after this tenure issue?
[14]      **Q.**     Let me ask you a better question.  You
[15]  said you were retaliated against for telling them they
[16]  were trampling on your rights?
[17]      **A.**     Correct.
[18]      **Q.**     Okay.  But you didn't tell them they were
[19]  trampling on your rights until after your tenure had
[20]  been vacated; right?
[21]      **A.**     I'm not sure what you're asking.
[22]      **Q.**     Okay.  We can come back to that.  Are you
[23]  aware of other faculty members at Fort Valley State
[24]  whose tenure was vacated in the same manner that yours
[25]  was?

VICTOR M. BROWN vs.
BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.

VICTOR M. BROWN
August 20, 2014

Page 53

[1]   **A.**   I know that Dr. Gray-Singh's tenure was
[2] also vacated.  But as I said earlier, I know that
[3] there are other faculty members at Fort Valley who was
[4] awarded tenure by President Rivers.
[5]   **Q.**   Who are they?
[6]   **A.**   William Hill -- Edward Hill got tenure by
[7] the president.  Melody Carter, who is not even
[8] academic, received tenure by the president.
[9]   **Q.**   And that was by President Rivers?
[10]   **A.**   By President Rivers.
[11]   **Q.**   Anyone else you know of?
[12]   **A.**   I know those two.
[13]   **Q.**   But do you know anyone else?
[14]   **A.**   Huh?
[15]   **Q.**   I'm making sure -- is there anyone else
[16] you know of?
[17]   **A.**   I'm sure there are others.  But I
[18] cannot -- I don't know them by name.  But I know those
[19] two were -- received tenure by President Rivers, just
[20] writing them a letter, awarding them tenure because he
[21] has right as president.
[22]   **Q.**   You said Melody Carter wasn't academic.
[23] What was her position?
[24]   **A.**   She's in administrative.  She's never
[25] taught.  She's always been in administrative roles.

Page 54

[1]   **Q.**   Do you know what her specific position is?
[2]   **A.**   She's the vice president for external
[3] affairs.
[4]   **Q.**   Okay.  You were hired -- I guess it would
[5] have been during the second semester of the 2012, '13
[6] school year; is that right?
[7]   **A.**   No, that's not correct.
[8]   **Q.**   Okay.  During what semester were you
[9] hired?
[10]   **A.**   I was there during the spring semester.
[11]   **Q.**   Right, right.  That's what I meant.  The
[12] spring semester of the 2012, 2013 school year?
[13]   **A.**   That's not correct.
[14]   **Q.**   What school year was it?
[15]   **A.**   2012 term.  Yes, 2012, 2013.  I thought it
[16] was 2013, 2014.
[17]   **Q.**   Can be tricky.  Did you have a signed
[18] contract just for the rest of that school year?
[19]   **A.**   From my recollection, I signed the
[20] acceptance letter and the one contract that I got that
[21] went through until July -- whatever it was.
[22] July 2014, I think.  No, July 2013.  You'll have to
[23] check the records.
[24]   **Q.**   I was gonna say, I haven't seen a formal
[25] contract for that semester.  I didn't know if you knew

Page 55

[1] of one.
[2]   **A.**   The only contract that I had was the one
[3] that I signed, which I'm sure that they have given you
[4] a copy of.
[5]         (Defendants' Exhibit 6 was marked for
[6] identification.)
[7]   **Q.**   (By Mr. McGraw)  Let's take a look at
[8] this.  I marked Exhibit 6.  Take a look at that for me
[9] and tell me if you recognize it.
[10]   **A.**   Yeah.
[11]   **Q.**   So this would have been your contract for
[12] the 2013, 2014 --
[13]   **A.**   Academic year.
[14]   **Q.**   -- year; right?
[15]   **A.**   Yeah.
[16]   **Q.**   Okay.  And that would have been the first
[17] full school year that you were going to be --
[18]   **A.**   Correct.
[19]   **Q.**   So I was asking before what the -- if
[20] there was a contract for the rest of that earlier
[21] school year.
[22]   **A.**   No.  There is one thing I want to point
[23] out for the record.  It did stipulate that I'm a
[24] tenured personnel.
[25]   **Q.**   On page 1, there's a paragraph that starts

Page 56

[1] with "your specific job-related duties."  Do you see
[2] that?
[3]   **A.**   Yes.
[4]   **Q.**   Further down in the paragraph, you see it
[5] says, "you are not guaranteed to hold your
[6] administrative position for the duration of the
[7] contract because you hold your administrative title
[8] and position at the pleasure of the president."
[9]         Do you remember that?
[10]   **A.**   Yes.
[11]   **Q.**   And then do you remember it goes on to
[12] say, "your tenure status applies only to your
[13] appointment as a faculty member and not to your
[14] appointed position as an administrator."
[15]   **A.**   Correct.
[16]   **Q.**   This was signed June 26th; correct?
[17]   **A.**   Correct.
[18]   **Q.**   Obviously that was before you were
[19] notified that they were vacating your tenure?
[20]   **A.**   Correct.
[21]   **Q.**   Page 3 also with me, please.
[22]         The last paragraph in the middle, you see
[23] it says, "in the case of a tenured faculty member who
[24] holds an administrative position, tenure status
[25] applies only to appointment as a faculty member and

VICTOR M. BROWN vs.
BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.

VICTOR M. BROWN
August 20, 2014

Page 57

[1] not to an appointed position as an administrator."

[2]     Do you remember that?

[3]     **A.**  That is correct.

[4]     **Q.**  And then it says, "the salary of any

[5] person who is directed to vacate an administrative

[6] position is subject, if that person is reassigned, to

[7] change by action of FVSU."

[8]     Do you remember that?

[9]     **A.**  Yes, sir.

[10]     **Q.**  And you signed right below that; right?

[11]     **A.**  I did.

[12]     (Defendant's Exhibit 7 was marked for

[13] identification.)

[14]     **Q.**  (By Mr. McGraw) Take a look at Exhibit 7,

[15] please. Tell me if you recognize that.

[16]     **A.**  Yes.

[17]     **A.**  What is this?

[18]     **A.**  My contract after they revoked my tenure.

[19]     **Q.**  So you remember receiving this?

[20]     **A.**  I remember receiving page 1. The rest of

[21] them, they don't bear my signature.

[22]     **Q.**  Okay.

[23]     **A.**  And this is -- this one, I don't recall.

[24] Because the one that I did was signed. So I don't

[25] know about this. I don't remember this. This doesn't

Page 58

[1] hold my signature, so there's nothing I can say about

[2] this.

[3]     **Q.**  That's what I was going to ask you. So

[4] you believe there was another version of this

[5] somewhere that you did sign?

[6]     **A.**  Anything that has my name that was sent to

[7] me, I signed. This does not bear my signature, so I

[8] can't talk to this.

[9]     **Q.**  Do you remember signing a revised contract

[10] after your tenure was vacated?

[11]     **A.**  I did sign a revised contract. But I did

[12] not sign this one, so I cannot speak about this one.

[13] I'm sorry.

[14]     **Q.**  I understand. But you're saying somewhere

[15] out there you think you did sign one?

[16]     **A.**  I believe I signed one. I did not sign

[17] this, so I cannot speak to this.

[18]     **Q.**  I understand. Okay. You've also asserted

[19] in your lawsuit that the defendants breached your

[20] contract. When you say that they somehow violated

[21] your contract, my assumption is that you're referring

[22] to Exhibit 6, is that right, the one where you're

[23] listed as tenured personnel?

[24]     **MS. MOLDEN:** I'm going to object to the

[25]     extent it calls for legal conclusion.

Page 59

[1]     **Q.**  (By Mr. McGraw) Again, I know you're not

[2] a lawyer, and I'm not asking you to articulate a legal

[3] conclusion.

[4]     But just so I know what we're talking

[5] about, is this the contract that they breached? It

[6] says you were dean. It says tenured personnel.

[7]     **A.**  The contract I'm referring to has two

[8] things. One, I came here on an assumption that I was

[9] being awarded rank and tenure. Two, I came here on

[10] the assumption that I was going to be a dean. I did

[11] not leave a dean job to become a faculty member. I

[12] can find a faculty member job myself.

[13]     **Q.**  And I won't belabor this anymore after

[14] this. But Exhibit 6, do you believe the defendants

[15] broke the terms of this contract?

[16]     **MS. MOLDEN:** I'll object to the form.

[17]     Same basis, calls for a legal conclusion.

[18]     **THE WITNESS:** Again, I came here as a dean

[19] and I came here as a tenured person. I came here

[20] for rank and tenure and continue in my role as a

[21] dean. Therefore, when they tried to reassign me

[22] as a faculty member, that is breaking what I came

[23] down here for. I didn't uproot myself to come

[24] here because of all of that.

[25]     **Q.**  (By Mr. McGraw) Okay. When you say

Page 60

[1] served as the dean of the college of arts and

[2] sciences, what were your responsibilities in that job?

[3]     **A.**  To manage the college of arts and

[4] sciences, which involves several programs.

[5]     **Q.**  I know that's a very broad job, I'm sure.

[6] But what in general were kind of your day-to-day

[7] activities or duties?

[8]     **A.**  Manage a college.

[9]     **Q.**  And how do you go about doing that? What

[10] sorts of things did you do during the day?

[11]     **A.**  The days were -- days differ.

[12]     **Q.**  So you can't describe the job to me at all

[13] other than to say it was to manage the college?

[14]     **A.**  No. I can answer a specific question.

[15] You asked me broad questions. I can't answer broad

[16] questions because it's a broad question. You ask me a

[17] specific question, I'll give you a specific response.

[18]     **Q.**  Wow. What did you have to do specifically

[19] to manage the college on a day-to-day basis? What

[20] types of duties were you --

[21]     **A.**  Program review, program accreditation,

[22] meeting faculty members, meet with the president, meet

[23] the president with whoever wanted to deal with

[24] business. Again, that's what I'm asking. You have to

[25] ask -- it depends on what you're looking for and it

VICTOR M. BROWN vs.
BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.

VICTOR M. BROWN
August 20, 2014

Page 61

[1] depends on what the day was. Sometimes I spent all
[2] day in meetings. It all depends on what I'm doing.
[3]         I'm not trying to be difficult. But,
[4] again, you're asking me a broad question, and I
[5] answered you with a broad answer, which is I manage a
[6] college.
[7]     Q.    Well, actually, the answer you just gave
[8] me was exactly what I was asking for.
[9]         How many people do you supervise?
[10]    A.    I was the biggest college. There was lots
[11] of faculty and staff that I supervised. In terms of
[12] direct reports, I had several direct reports.
[13]    Q.    Like how many? Was it less than five?
[14] Was it more like 20?
[15]    A.    In terms of the direct reports, there were
[16] about ten, if I'm not mistaken, or more chairs. Yeah,
[17] somewhere in that region.
[18]    Q.    I'm sorry. Were you done?
[19]    A.    Go ahead.
[20]    Q.    Those would have been chairs of the
[21] departments within the college of arts and sciences?
[22]    A.    Correct.
[23]    Q.    And then those chairs, in turn, supervised
[24] the faculty members in their departments; is that
[25] right?

Page 62

[1]    A.    Correct.
[2]    Q.    And you said there are about ten? I'm
[3] sorry.
[4]    A.    I don't remember offhand. I can only
[5] approximate there are about ten different chairs. I
[6] cannot give you a direct answer.
[7]    Q.    Okay. That's fine. And I think you said
[8] earlier your direct supervisor was Canter Brown.
[9]    A.    Officially, yes.
[10]    Q.    Did that change at any point while you
[11] were dean?
[12]    A.    When Canter Brown was reassigned, Linda
[13] Noble stepped in as interim VP.
[14]    Q.    Okay. Do you know about when that was?
[15]    A.    I can't recall the exact date.
[16]    Q.    But do you know generally?
[17]    A.    I can't recall the exact date, sir.
[18]    Q.    But I'm not asking you the exact date. Do
[19] you recall in general around when that was?
[20]    A.    If I remember, I'll let you know. But I
[21] can't recall off the top of my head.
[22]    Q.    You said Canter Brown was reassigned to
[23] another job?
[24]    A.    Correct.
[25]    Q.    And then Linda Noble came in as the

Page 63

[1] interim in his place?
[2]    A.    Correct.
[3]    Q.    So she became your direct supervisor?
[4]    A.    Correct.
[5]    Q.    Okay. So you were arrested on August 25th
[6] in Houston County; is that right?
[7]    A.    Correct.
[8]    Q.    And the charges, I understand it was
[9] criminal trespass and damage; is that right?
[10]    A.    Correct.
[11]    Q.    Tell me what happened on August 25 that
[12] led to your being arrested.
[13]    A.    My partner and I had an argument. I went
[14] into my room. I closed the door. A picture fell and
[15] broke. He went to the back room. The door got
[16] damaged in our apartment. The police came, asked us
[17] who started -- who started the altercation, who was
[18] fighting. We said we weren't fighting. We were just
[19] arguing.
[20]         They said, based on Georgia and Houston
[21] County law, they had to arrest us because we tell them
[22] who was fighting -- or who was the aggressor. That's
[23] the phrase they used, who was the aggressor.
[24]    Q.    You said a door got broken?
[25]    A.    I think it got damaged or broken. One of

Page 64

[1] the two.
[2]    Q.    How did that happen?
[3]    A.    Because the door was -- door was not all
[4] the way broken, but I know it got damaged. I can't
[5] remember what happened. There was slamming the door
[6] or something. I don't know. I know when the door
[7] closed, a picture fell off, and the glass broke.
[8]    Q.    Who called the police?
[9]    A.    We both did. He had my key. I had his
[10] key. We wouldn't give back the keys. We wanted the
[11] police to mediate us to turn in the keys.
[12]    Q.    So were you actually taken to jail?
[13]    A.    That's what arrested means, if I'm not
[14] mistaken.
[15]    Q.    Is that a yes?
[16]    A.    Yes, we were taken to jail.
[17]    Q.    Were you then released on bond?
[18]    A.    We were.
[19]    Q.    And I believe you reported the arrest to
[20] Fort Valley State; is that right?
[21]    A.    That is correct.
[22]    Q.    To whom did you report it?
[23]    A.    I reported it to my immediate supervisor,
[24] Linda Noble, who assured me that, if what I told her
[25] was true, I would not be removed as dean. That's what

VICTOR M. BROWN vs.
BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.

Case 1:14-cv-00365-LMM-LTW   Document 54   Filed 03/04/15   Page 18 of 33

VICTOR M. BROWN
August 20, 2014

Page 65

[1] she told me.
[2]     I reported it to Tricia Addison, who told
[3] me just to -- pretty much that -- okay.  And I
[4] reported it to Ms. Eddy as well, who is our compliance
[5] officer, because that is what is stipulated by Fort
[6] Valley policy.
[7]   Q.   Is that Denis Eddy?
[8]   A.   Correct.
[9]   Q.   What exactly did you tell Linda Noble?
[10]   A.   That my partner and I had an argument and
[11] I was arrested.  And I'm out.  So we're going to have
[12] the case dismissed, because there was no altercation.
[13] That's what we were charged with, criminal trespass in
[14] our apartment.  It was criminal trespass and --
[15] damage?  Whatever it was.  Damage of property.
[16]   Q.   When you said you were going to have the
[17] case dismissed, what did you mean?
[18]   A.   There was no grounds for us being
[19] arrested.  Because the police was trying to figure
[20] out -- trying to say that we were fighting or
[21] altercation.  But there was none.  There was just
[22] arguing, like any couple do.
[23]   Q.   You're saying there was no physical
[24] altercation?
[25]   A.   There was no physical altercation.  Just

Page 66

[1] an argument.
[2]   Q.   And tell me as much as you can remember
[3] what Linda Noble told you in response.
[4]   A.   When I told Linda Noble, she told me,
[5] don't worry about it.  I should continue my
[6] responsibilities as dean.  That's what Linda Noble
[7] told me.  She said there's no reason why I can't
[8] continue.  There's no reason why I shouldn't continue
[9] as dean.
[10]   Q.   Was this an in-person meeting?
[11]   A.   It was in-person meeting.
[12]   Q.   Do you remember how long that was after
[13] the arrest?
[14]   A.   The day after the arrest.
[15]   Q.   Tell me what you can remember about what
[16] Tricia Addison said in response.
[17]   A.   She said okay.
[18]   Q.   So what was the next thing that
[19] happened --
[20]   A.   Matter of fact -- backtracking, let me say
[21] something that I remember Tricia Addison saying.  When
[22] I spoke to Tricia Addison, she asked me if I had an
[23] anger management problem.  And I told her, no, I
[24] don't.  Couples argue like couple do.  That was her
[25] response.

Page 67

[1]     After I spoke to her about that, she then
[2] went and told someone who told me that she thinks that
[3] I have an anger management problem and I needed to go
[4] and get help for it.
[5]     And when she and I spoke, I was talking to
[6] her in confidence, because she's HR.  She then went
[7] and told other people about the arrest and then told
[8] Dr. Glen Jones that I have an anger management problem
[9] and that that was one of the reasons why I was where I
[10] was.
[11]   Q.   Who is Glen Jones?
[12]   A.   Dr. Glen Jones is the -- I don't know if
[13] it's coordinator or -- the program chair for early
[14] childhood development as TCI -- sorry -- at Fort
[15] Valley.
[16]   Q.   Do you know anyone else that Tricia
[17] Addison told about your arrest?
[18]   A.   If there is anybody off the top of my
[19] head, I can't recall.
[20]   Q.   So after you reported this to Noble and
[21] Addison and Eddy, what was the next thing that
[22] happened in the process?
[23]   A.   The next thing that happened in the
[24] process, I remember one day a reporter called me -- a
[25] reporter called me and asked me if I have any comment.

Page 68

[1] And I told him no.
[2]     I then discussed that with the president,
[3] Ivelaw Griffith.  Ivelaw Griffith told me that he's
[4] going to discuss it with Linda Noble.  He talked to
[5] Linda Noble, and that's when I was placed on
[6] academic -- I was placed on administrative leave.
[7]   Q.   Who did the reporter work for?
[8]   A.   Some newspaper in Montgomery.  I don't
[9] remember the name of the newspaper.
[10]   Q.   In Montgomery, Alabama?
[11]   A.   Macon, Alabama.  Sorry.  Macon, Georgia.
[12]   Q.   Macon, Georgia.  We all knew what you
[13] meant.
[14]   A.   Macon, Georgia, yeah.  Macon, Georgia.
[15]   Q.   When was that that he came to talk to you?
[16]   A.   They didn't come.  They called me.  That
[17] was on the 27th.  Or the same day I was placed on
[18] administrative leave.  So that was probably the 27th
[19] or 28th.
[20]   Q.   Two or three days after the arrest,
[21] something like that?
[22]   A.   Two, three days after the arrest.
[23]   Q.   Was there an article in the paper right
[24] after that?
[25]   A.   Not that I saw.

Page 69

[1]     Q.    So you said next you were put on
[2]  administrative leave.  How did you find out about
[3]  that?
[4]     A.    Like I said, I just left Linda Noble's
[5]  office.  She told me everything is okay.  Continue my
[6]  responsibility as dean.  Then I went downstairs to
[7]  have a conversation, Tricia Addison because she was
[8]  waiting to talk to me.
[9]           In the middle of the conversation with
[10]  her, she stopped to take a call from Linda Noble.  She
[11]  said, Dr. Brown, I'm sorry to inform you, but I was
[12]  just told by Linda Noble that she and President
[13]  Griffith has advised me that you're on administrative
[14]  leave.  And I asked her, when is this?  She said she
[15]  doesn't known when it's effective.  She called them
[16]  back, and they said it was effective immediately.
[17]     Q.    Do you remember what day that was?
[18]     A.    I think the -- August 28th, I think.
[19]  27th, 28th, somewhere in that region.
[20]     Q.    Do you have any more conversations with
[21]  Linda Noble about the arrest other than the one you
[22]  already told me about up to this point?
[23]     A.    No, not to my knowledge.  All I know is
[24]  that she said -- when I talked to Linda and Charles --
[25]  because Charles was there as legal counsel.  She told

Page 70

[1]  me she was going -- they were going to do an
[2]  investigation.  At the end of the investigation, I
[3]  will be reinstated.  They did their investigation.
[4]  Nobody contacted me as to what happened.
[5]     Q.    When was that meeting you just mentioned?
[6]     A.    That was probably that day -- the same day
[7]  I reported this to Linda, which was probably the 26th,
[8]  27th, somewhere in that region.  The day I reported it
[9]  to Linda.
[10]     Q.    Okay.  And the charge --
[11]     A.    My time frame may be a day or two off.  I
[12]  have to check some of my notes.
[13]     Q.    The Charles you just referred to is
[14]  Charles Jones?
[15]     A.    Legal counsel for Fort Valley.
[16]     Q.    And you said you have some notes.  Have
[17]  you produced those in the lawsuit?
[18]     A.    My lawyer has everything.
[19]     Q.    Okay.  I don't know that I've got those
[20]  notes.
[21]     A.    Not notes.  Chronology of time frame, just
[22]  for me to understand.
[23]           MR. MCGRAW: So we request that they be
[24]  produced, but we can discuss that later.
[25]           MS. MOLDEN: Yeah, we can.  Because if it

Page 71

[1]  was something that I was working -- because you'd
[2]  need a privilege log.  But I will --
[3]           MR. MCGRAW: We can work that out.
[4]           MS. MOLDEN: Okay.
[5]     Q.    (By Mr. McGraw)  Did you offer to Linda
[6]  Noble to resign?
[7]     A.    Never did.
[8]     Q.    Who else did you tell about the arrest
[9]  besides Eddy, Noble, and Addison?
[10]     A.    At Fort Valley, nobody.
[11]     Q.    Okay.  What about outside of Fort Valley?
[12]     A.    Nobody.
[13]     Q.    And the arrest was eventually reported in
[14]  the local paper; right?
[15]     A.    Never was.  It was never reported to --
[16]  I've never seen or heard of it reported.  What I know
[17]  happened, Linda Noble sent out an email to all of Fort
[18]  Valley telling them that I was arrested.
[19]           And I know for a fact too that Fort Valley
[20]  also sent information to -- the members of board of
[21]  directors.  And they sent an email all the way to
[22]  Saudi Arabia, to a friend of mine who is over the
[23]  board -- to tell her that I was arrested and sent her
[24]  all kind of information about it.  And she then
[25]  emailed me back to talk to me about it.

Page 72

[1]     Q.    Who is that?
[2]     A.    Marshalett Wise.
[3]     Q.    And what was her connection to Fort
[4]  Valley?
[5]     A.    She has none.  Her connection was to me.
[6]  She has none.
[7]     Q.    Who sent her an email?
[8]     A.    She didn't tell me.  She said that she was
[9]  informed -- she said she was sent an anonymous email
[10]  from Fort Valley stating that I was arrested.
[11]     Q.    And she has no connection to Fort Valley?
[12]     A.    She has none.
[13]     Q.    Who is she?  How do you know her?
[14]     A.    Because since she has an organization
[15]  called wise colors foundation -- and I'm a member of
[16]  the board of directors.
[17]     Q.    You said earlier that you reported the
[18]  arrest to Linda Noble, and she said, if what you're
[19]  saying is true, you should keep on as dean; right?
[20]     A.    Correct.
[21]     Q.    You also said that you had a meeting with
[22]  her and Charles Jones, where they said they would be
[23]  doing an investigation; right?
[24]     A.    Correct.
[25]     Q.    Were those the same meeting, or are those

VICTOR M. BROWN vs.
BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.

VICTOR M. BROWN
August 20, 2014

Page 73

[1] two different meetings?
[2]    A.    Same day.  She and I met earlier to talk.
[3] I don't think Mr. Jones was there.  She and I met to
[4] talk.  Mr. Jones was in on the meeting.
[5]    Q.    Okay.  So those were two meetings, but on
[6] the same day?
[7]    A.    Correct.
[8]    Q.    So while you were on administrative leave,
[9] were you not to be on campus at all?
[10]    A.    That was my understanding, I should not be
[11] on campus.
[12]    Q.    Did you still get paid while you were on
[13] leave?
[14]    A.    Yes, I did get paid while I was on
[15] administrative leave.
[16]    Q.    So after you were told to go on
[17] administrative leave, what was the next thing that
[18] happened with Fort Valley State?
[19]    A.    I got a text from Tricia Addison asking me
[20] to surrender my keys.
[21]    Q.    Do you know when that was?
[22]    A.    Not off the top of my head.  But I can
[23] research and get back to you.
[24]    Q.    And I'm not concerned about the specific
[25] date.  But was this something that kind of happened

Page 74

[1] right away when they put you on leave, or was it
[2] towards the end?
[3]    A.    Probably a week or two after I was on
[4] leave.
[5]         (Defendant's Exhibit 8 was marked for
[6]    identification.)
[7]    Q.    (By Mr. McGraw)  Take a look at Exhibit 8,
[8] please, and tell me if you recognize that.
[9]    A.    Yes, I do.
[10]    Q.    What is that?
[11]    A.    The email that Linda Noble sent to the
[12] entire Fort Valley family telling them that I'm facing
[13] pending criminal charges.
[14]    Q.    Is this the email that you referred to
[15] earlier?
[16]    A.    That is correct.
[17]    Q.    Okay.  And did you feel that this was
[18] inappropriate?
[19]    A.    Yes, I do.
[20]    Q.    Why is that?
[21]    A.    There are other people at Fort Valley who
[22] have gone through similar situations, and to my
[23] knowledge no such email was sent out.
[24]    Q.    Who are the other people at Fort Valley
[25] who have gone through similar situations that you know

Page 75

[1] of?
[2]    A.    People have been arrested there before and
[3] no email was sent out.
[4]    Q.    Who do you know of who was arrested?
[5]    A.    You have -- oh, gosh.  I can't remember
[6] his name.  But he's a director of -- he's one of the
[7] directors there of -- I want to say student services
[8] department.  He was arrested.  I can't remember if it
[9] was for drunk driving or drugs in his car.  No email
[10] was sent.  He's still working there.
[11]    Q.    Anyone else you know of?
[12]    A.    Fort Valley has people there who -- they
[13] have had gone through criminal investigation, criminal
[14] charges, and they're still there.  There's a former
[15] vice president.
[16]    Q.    Who is that?
[17]    A.    Dr. Davis.
[18]    Q.    What is his first name?
[19]    A.    Her first name.  I'm not sure her first
[20] name.  I'm sure Fort Valley can let you know.  She's
[21] former vice president of academic affairs.
[22]    Q.    To your knowledge, what was the arrest --
[23] what was the situation they were investigating?
[24]    A.    Embezzlement.  Fort Valley, since I've
[25] been asked to leave, they employed -- I can't remember

Page 76

[1] his name is -- as interim director, who is in the
[2] newspaper where he was charged for embezzlement for --
[3] in a school district that he works.  It's in the
[4] newspaper.
[5]    Q.    And I'm sorry.  What was his connection to
[6] Fort Valley State?
[7]    A.    He was employed after I was fired -- or
[8] after I was -- well, not -- I don't know if I was
[9] fired or what happened.  But after I left -- put it
[10] they way -- they employed him.
[11]    Q.    You're saying he was arrested, embezzled
[12] from a local school board?
[13]    A.    School direct.  It was in the newspaper.
[14]    Q.    And you're saying he was hired at Fort
[15] Valley State after that?
[16]    A.    Correct.
[17]    Q.    And going back to the Dr. Davis --
[18]    A.    And he was employed by Ivelaw Griffith.
[19]    Q.    Okay.  Dr. Davis, I believe you mentioned,
[20] that was a different situation from the person you
[21] were just talking about; right?  I think you mentioned
[22] she had embezzled --
[23]    A.    No.  You asked me to explain several other
[24] people --
[25]    Q.    Right, right.

VICTOR M. BROWN vs.
BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.

VICTOR M. BROWN
August 20, 2014

Page 77

[1]  **A.**  -- who have gone through trouble with the
[2]  law, who did this similar thing. And I'm giving you
[3]  some examples.
[4]  **Q.**  I understand. I'm trying make sure that I
[5]  followed. The Dr. Davis situation, that was different
[6]  from this other person --
[7]  **A.**  There are three examples I gave you.
[8]  One was that -- is a director of one of
[9]  the student services' functions, who was at -- drunk
[10]  driver or drugs in his car. Such email was not sent
[11]  out. That's the first.
[12]  Two, Dr. Davis, who is one of the
[13]  finalists for the dean position, she's been charged
[14]  with embezzlement of Fort Valley institution. If you
[15]  go to the web and search it. No such thing has been
[16]  sent out about her.
[17]  Three, when -- after I was let go for
[18]  whatever -- according to him, I don't fit in with the
[19]  Fort Valley image, they went to employ somebody from
[20]  the newspaper and online. He was charged -- he was
[21]  facing embezzlement charges and was forced to resign
[22]  his job. And they employed him after they told me
[23]  that my -- however they put it. Doesn't fit into Fort
[24]  Valley.
[25]  **Q.**  Okay. Dr. Davis, was she employed there

Page 78

[1]  while you were?
[2]  **A.**  Yes, she was. She was interim dean.
[3]  **Q.**  Of what?
[4]  **A.**  College of arts and sciences.
[5]  **Q.**  Okay. When did this embezzlement issue
[6]  happen with her? Is that while you were still there?
[7]  **A.**  No, not while I was there.
[8]  **Q.**  Okay. It was after you left?
[9]  **A.**  Correct. No, that was before I got there.
[10]  She was -- she's had several positions there. Like I
[11]  said, if you want to get into specifics, I don't
[12]  remember the month, and I don't want to misspeak. You
[13]  can get her name. Go online and type her name, and
[14]  all that would come up.
[15]  **Q.**  You understand this embezzlement issue
[16]  with her was before you got there?
[17]  **A.**  Correct.
[18]  **Q.**  And then she was still there while you
[19]  were?
[20]  **A.**  Right.
[21]  **Q.**  Going back to you, you were on
[22]  administrative leave. And you said Tricia Addison had
[23]  texted you to turn in your keys?
[24]  **A.**  Correct.
[25]  **Q.**  What was the next thing that happened in

Page 79

[1]  that process?
[2]  **A.**  I got the call from Linda Noble to turn up
[3]  to meet with her.
[4]  **Q.**  And do you remember when that was?
[5]  **A.**  September -- towards the end of September.
[6]  Probably September 28th, September 21st, somewhere in
[7]  that region.
[8]  **Q.**  So you came to meet with her?
[9]  **A.**  Right. Thought I was meeting with her.
[10]  When I walked into the meeting, there was legal and
[11]  there was HR.
[12]  **Q.**  So was that Charles Johnson and Tricia
[13]  Addison?
[14]  **A.**  Correct.
[15]  **Q.**  What happened in that meeting?
[16]  **A.**  I was handed two letters. One that says
[17]  that I'm being removed as dean and reassigned as
[18]  faculty member to work on a project. The second one
[19]  was that my contract would not be renewed.
[20]  She asked me if I had any feedback in
[21]  response. I told her no, because I was not prepared.
[22]  Because when I went to this meeting, I was under the
[23]  impression that I would be reinstated. I was not
[24]  prepared to be given a letter saying that I'm being
[25]  reassigned and that my contract would not be renewed.

Page 80

[1]  When I told her, she pretty said much said
[2]  I had no choice. At that point in time, legal stepped
[3]  in and said, no, he has some time to think about it,
[4]  consult with an attorney, and get back to us.
[5]  **Q.**  Did anyone in the meeting give you any
[6]  reasons for why they were doing this?
[7]  **A.**  According to -- the letter basically says
[8]  that I have a pattern of behavior and that my pattern
[9]  of behavior does not fit in with the Fort Valley
[10]  profile, to paraphrase.
[11]  **Q.**  You said according to the letter?
[12]  **A.**  And what was said, yes.
[13]  **Q.**  Okay. Is there anything else you can
[14]  remember that they told you about why they were doing
[15]  that?
[16]  **A.**  Just what I said. Nothing -- I can't
[17]  recall at this time.
[18]  **Q.**  So they told you you were being reassigned
[19]  from the dean position to a faculty position?
[20]  **A.**  Correct.
[21]  **Q.**  And was your rank going to be assistant
[22]  professor?
[23]  **A.**  I had no rank at all.
[24]  **Q.**  Were you going to be in the biology
[25]  department?

VICTOR M. BROWN vs.
BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.

VICTOR M. BROWN
August 20, 2014

Page 81

[1]    A.    I had no rank, no place -- well, I was
[2]  being given a project to work on, for which I had no
[3]  expertise at all.  None.  For the rest of the
[4]  semester, I was being given to work on a project that
[5]  I have no qualifications, no prior experience for the
[6]  rest of -- that was the fall semester.  And then in
[7]  the spring semester I was supposed to work on -- be a
[8]  faculty member in the biology department.
[9]    Q.    What was the project?
[10]    A.    Work on a diversity plan.
[11]    Q.    What was the diversity plan?  What was
[12]  that supposed to be?
[13]    A.    Again, that is something social sciences.
[14]  I am a biologist.  I have no idea what a diversity
[15]  plan was going to look like.  That's not my area of
[16]  expertise or scope of experience.
[17]    Q.    If you know, was it to be about diversity
[18]  in the student body or the faculty?
[19]    A.    Again, diversity is not my scope of
[20]  experience.  And I explained that to Linda and the
[21]  president that they're giving me a project to work on
[22]  that I have no experience or qualifications to do.
[23]    Q.    I'm trying to get what your understanding
[24]  of the project was.  I know you were saying you
[25]  weren't qualified for it.  But did they explain what

Page 82

[1]  they were asking you to do about what this plan was
[2]  supposed to be about?
[3]    A.    The plan was supposed to be about how do
[4]  other institutions handle sexual diversities in terms
[5]  of gay, straight, whatever.  That is what it would
[6]  entail.  And that I have no in terms of -- I might be
[7]  gay, but I have no expertise in -- and I was given a
[8]  diverse plan that we could enact at Fort Valley or use
[9]  at Fort Valley.  That's not my area of expertise.
[10]    (Defendant's Exhibit 9 was marked for
[11]  identification.)
[12]    Q.    (By Mr. McGraw)  Take a look at Exhibit 9,
[13]  please, and tell me if you recognize that.
[14]    A.    Yes.
[15]    Q.    What is that?
[16]    A.    This is a letter that Linda Noble gave me.
[17]    Q.    This is the one you referred to earlier?
[18]    A.    That is correct.
[19]    Q.    So this letter doesn't really elaborate,
[20]  as far as I can tell, about what sort of diversity
[21]  it's referring to.  But you're saying in the meeting
[22]  they said the diversity was in regard to sexual
[23]  orientation?
[24]    A.    Pretty much.
[25]    Q.    Okay.

Page 83

[1]    A.    Diversity including sexual orientation.
[2]    Q.    Is that in here somewhere?
[3]    A.    That's what Linda Noble told me.
[4]    (Defendant's Exhibit 10 was marked for
[5]  identification.)
[6]    Q.    (By Mr. McGraw)  That's what she told you
[7]  verbally, okay.
[8]    Take a look at Exhibit 10, please.  Tell
[9]  me if you recognize that document.
[10]    A.    Yes, I do.
[11]    Q.    What is that?
[12]    A.    My non-renewal contract letter.
[13]    Q.    So this letter was telling you that you
[14]  would not be getting a new contract for the 2014, 2015
[15]  school year; is that right?
[16]    A.    Correct.  Which basically abrogated my --
[17]  which basically cut my original contract.  Because
[18]  this contract, according to them, goes up to May 15th.
[19]  My original contract goes up to June 30th.
[20]    Q.    Do you know why that was?
[21]    A.    I have no idea.
[22]    Q.    Are you aware whether there's generally a
[23]  difference in the length of the contract for deans and
[24]  for faculty members?
[25]    A.    I have no idea how Fort Valley organizes

Page 84

[1]  their contracts.
[2]    (Defendant's Exhibit 11 was marked for
[3]  identification.)
[4]    Q.    (By Mr. McGraw)  Take a look at No. 11,
[5]  please.  Tell me if you recognize that.
[6]    A.    No.  I have no idea where this come from.
[7]  I have never seen this before.  This is a fabricated
[8]  document.  I was in a meeting with Linda Noble,
[9]  Charles Jones, and Tricia Addison -- never ever showed
[10]  me this or gave me a copy of this.
[11]    Q.    This document says that your salary going
[12]  forward is $86,250.  Setting aside the document
[13]  itself, was that what they paid you going forward?
[14]    A.    I will not respond to this because I have
[15]  never seen this document before, so I'm not going to
[16]  respond to it.
[17]    Q.    I understand.  I'm not asking you about
[18]  the document.  But from that point forward, was your
[19]  salary $86,250 --
[20]    A.    I have no idea.
[21]    MS. MOLDEN:  Let him finish his question.
[22]    Q.    (By Mr. McGraw)  After you're reassigned
[23]  from dean, did your salary change?
[24]    A.    Based on what this says in the -- Linda
[25]  Noble's letter September 18, 2013, between

VICTOR M. BROWN vs.
BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.

VICTOR M. BROWN
August 20, 2014

Page 85

[1]  September 18th to May 15th, my salary -- between
September 18th, 2013, to May 15th, 2014, my salary was
[3]  going to be 86,250.
[4]      Q.   Okay.  After this meeting, which notified
[5]  you of all these changes, did you then take annual
[6]  leave for a while?
[7]      A.   I took a week.  After the meeting I told
[8]  them I needed some time to confer with my attorney.
[9]  So I took a week in order to meet and confer with my
[10]  attorney to decide about what is the best course of action.
[11]      Q.   Did you ever come back to work at Fort
[12]  Valley after that?
[13]      A.   My attorney tried to meet with them to
[14]  negotiate and to bring this mutually beneficial
[15]  conclusion, and they ignored her letters.  They
[16]  ignored all the letters that I sent to them.  They
[17]  ignored the first letter I sent to them.
[18]          They finally responded, saying that their
[19]  situation has not changed, and if I don't accept what
[20]  they were offering me, then they're going to bill it
[21]  as me abandoning my job.
[22]      Q.   The attorney you referred to, was that
[23]  Ms. Molden at the time?
[24]      A.   Correct.
[25]

Page 86

[1]          (Defendant's Exhibit 12 was marked for
[2]  identification.)
[3]      Q.   (By Mr. McGraw)  Take a look at
[4]  Exhibit 12, please, and tell me if you recognize that.
[5]      A.   Yes, I do.
[6]      Q.   What is that?
[7]      A.   Two things.  One, me telling them that I'm
[8]  got going to accept being reassigned to a faculty
[9]  position, because I came there -- because I came there
[10]  as being in arts and sciences.  And, secondly, that
[11]  I'm a cell and molecular biologist, and I have no
[12]  experience in completing a -- I have no experience in
[13]  working as a diversity leader.
[14]      Q.   This is a letter that you sent to Linda
[15]  Noble?
[16]      A.   That is correct.
[17]      Q.   This was in response to the meeting we
[18]  just talked about?
[19]      A.   Right.  And in this letter also -- she
[20]  told me that if I did not return to work, I -- when I
[21]  received her letter, it's considered me abandoning my
[22]  employment.
[23]          (Defendant's Exhibit 13 was marked for
[24]  identification.)
[25]      Q.   (By Mr. McGraw)  Take a look at No. 13,

Page 87

[1]  please, and tell me if you recognize that.
[2]      A.   Yes, I do.
[3]      Q.   What is that?
[4]      A.   It's a letter from Linda Noble stipulating
[5]  that they have -- that my behavior is not consistent
[6]  with the leadership philosophy at Fort Valley and that
[7]  I'm being reassigned and that if I don't -- and I
[8]  should report on the date when I get this.  I should
[9]  report on -- what date?  That the day I receive this,
[10]  I should contact Dr. Mbata, who is supposed to be my
[11]  supervisor, pretty much.  And that my failure to do so
[12]  will include disciplinary action up to and including
[13]  termination.
[14]      Q.   This is a letter you received from Linda
[15]  Noble; right?
[16]      A.   Correct.
[17]      Q.   And it was dated October 4th?
[18]      A.   Correct.
[19]      Q.   And was this is a response to the letter
[20]  you sent that's Exhibit 12?
[21]      A.   Correct.  Let's also be clear that my
[22]  attorney sent them a letter, asking them to negotiate.
[23]  And Charles Jones sent her a letter stipulating that
[24]  if I don't turn up, Fort Valley will consider that I
[25]  abandoned my employment.  So let's be clear on that

Page 88

[1]  one.
[2]          (Defendant's Exhibit 14 was marked for
[3]  identification.)
[4]      Q.   (By Mr. McGraw)  Take a look at
[5]  Exhibit 14, please.  Is that the letter you were just
[6]  referring to from your lawyer?
[7]      A.   No, this is not from my lawyer.  This is a
[8]  letter from Ivelaw Griffith.
[9]          Yeah.  Sorry, sorry.  It's from Regina.
[10]      Q.   Okay.  And that's what you've been
[11]  referring to that your lawyer attempted to negotiate
[12]  with them; is that right?
[13]          And just -- when I hand you these, take
[14]  your time to look them over.  Don't feel like you have
[15]  to answer in a hurry.
[16]      A.   No, I am.
[17]      MS. MOLDEN:  Listen to his question and
[18]  make sure you understand it.
[19]      THE WITNESS:  I know there are several
[20]  letters that were sent.  I'm sure that you guys
[21]  have a copy.  I know she sent this.  She also
[22]  sent another one.  I think it was one sent before
[23]  this.
[24]          So I would like to see if there were any
[25]  other letters that you have that she sent.  I

VICTOR M. BROWN vs.
BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.

VICTOR M. BROWN
August 20, 2014

Page 89

[1] would like to see it before I respond to the
[2] question. Because I want to respond to the
[3] entire question.
[4]     Q.    (By Mr. McGraw) I do not have any other
[5] letters that she sent with me. They may well be in
[6] our file. I'm not doubting that. I don't have any
[7] others with me.
[8]         MS. MOLDEN: So, when you talk about the
[9]     letters, I would say that probably a better word
[10]     is communications. Because I think there were
[11]     communications other than letters. Just to help.
[12]         THE WITNESS: I'm going to respond. In
[13]     fact, I know that communication was sent to Fort
[14]     Valley about the fact that we should meet and
[15]     discuss it. And my lawyer was informed that if I
[16]     don't turn up, it was going to be viewed as me
[17]     abandoning my job and that it was sent from Fort
[18]     Valley's attorney. That's how I would rather
[19]     answer that question.
[20]     Q.    (By Mr. McGraw) Just to make sure I
[21] understand. Do you recognize Exhibit 14 as at least
[22] one of the communications your lawyer sent to Fort
[23] Valley?
[24]     A.    This is a piece of communication that was
[25] sent on my behalf to Fort Valley.

Page 90

[1]     Q.    You're saying there may have been others?
[2]     A.    Correct.
[3]         (Defendant's Exhibit 15 was marked for
[4]     identification.)
[5]     Q.    (By Mr. McGraw) Now take a look at
[6] Exhibit 15, please, and tell me if you recognize that.
[7]     A.    Correct. This is the letter where
[8] Mr. Jones stipulated that I abandoned my employment.
[9]     Q.    Okay. He's saying if you don't come back,
[10] then we will -- Fort Valley State will assume that
[11] you've abandoned your job?
[12]     A.    This is a job -- I explained to Fort
[13] Valley that, one, I was in consultation with my
[14] lawyer. Two, that I am not going to accept a position
[15] that I'm not qualified for. And there were things
[16] that were -- I wanted to see what is the best outcome.
[17] And in the midst of everything, this was a letter that
[18] was sent.
[19]     Q.    So from this point forward, you never came
[20] back to work at Fort Valley State; is that right?
[21]     A.    I was told that I abandoned my job, and
[22] they ceased paying me.
[23]     Q.    I know you have an explanation. But I was
[24] trying to find out -- you never came back to work
[25] after this, regardless of whose fault it was?

Page 91

[1]     A.    I was told that I abandoned my job, and
[2] they ceased payment.
[3]     Q.    Okay. Again, I'm not arguing about whose
[4] fault it was. I'm just asking -- you never worked at
[5] Fort Valley State again after that; is that right?
[6] I'm not saying it's your fault or anybody else's. It
[7] was a factual question.
[8]     A.    I was told that I abandoned my job, and
[9] they ceased paying me. That's what I understand.
[10]     Q.    I understand. So all I'm asking you is --
[11] I understand your position on that. But you never
[12] worked at Fort Valley State again after that; is that
[13] right?
[14]     A.    No, I never worked at Fort Valley State
[15] again after that.
[16]     Q.    Going back briefly to Exhibit 14, which
[17] was the letter -- at least one of the letters that
[18] your lawyer sent to Fort Valley State.
[19]         Did it accurately reflect your intentions
[20] regarding your job at Fort Valley State?
[21]     A.    Correct.
[22]     Q.    So the result of these meetings and
[23] communications was that you were told you could
[24] continue for the rest of the year at Fort Valley State
[25] first working on the diversity plan and then to teach

Page 92

[1] in the spring semester; is that right?
[2]     A.    Based on the meeting that I was summoned
[3] to, I was given a letter that told me I had to work in
[4] the diversity plan. I had no choice but to work on
[5] the diversity plan for the rest of the semester and
[6] then teach for the following semester.
[7]     Q.    Okay. And you refused that assignment; is
[8] that right?
[9]     A.    No. If my contract was being changed, I
[10] wanted to be a part of the negotiations and
[11] discussions and consultation with my lawyer.
[12]         When I was summoned to a meeting, I was
[13] not told I needed to have legal representation there.
[14] I told Dr. Noble that I would like to consult with a
[15] lawyer and meet again. In the presence --
[16] she initially objected. But when Mr. Jones
[17] interjected, she agreed. But I was never ever given a
[18] chance to meet with them with my attorney. Even after
[19] my attorney told them she represented me, they
[20] completely ignored it. So I was summoned and told
[21] what I was going to do, not -- we did not have a
[22] negotiation or I did not have a say what was done.
[23]     Q.    But after you were told that that's what
[24] your assignment would be, you rejected that
[25] assignment; is that right?

VICTOR M. BROWN vs.
BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.

VICTOR M. BROWN
August 20, 2014

Page 93

[1]     A.    I did not reject an assignment.  I was
[2] being given an assignment that I have no expertise to
[3] do.  And I wanted to make sure I negotiated -- I had a
[4] discussion with them after legal consultation, which I
[5] know was my right if I'm going to be reassigned and my
[6] contract was going to be changed.
[7]           So I didn't reject anything.  I wanted to
[8] have a discussion with legal counsel, with advisement
[9] properly and protect my interests.
[10]    Q.    And I'm not referring necessarily to just
[11] at the meeting.  But ultimately you declined to take
[12] on the assignment they gave you; is that right?
[13]    A.    Again, my response is going to be the same
[14] no matter how many times you ask the question.
[15]    Q.    You haven't answered my question yet.
[16]    A.    I beg to differ.
[17]    Q.    Here's what I'm asking.  You can explain
[18] all your reasons afterwards.  But all I'm asking you
[19] is, did you decline to take on the assignment that
[20] they were giving you?
[21]          MS. MOLDEN:  And I'll object, because he
[22]    did answer.  He said he never rejected the
[23]    assignment.  So I'm going to object based on the
[24]    question being asked and answered.
[25]    Q.    (By Mr. McGraw)  Okay.  Did you ever

Page 94

[1] complete or take on that assignment that they gave
[2] you?
[3]     A.    Before my lawyer and me could meet with
[4] them to discuss and negotiate, I was told that I
[5] abandoned my job, and they ceased paying me.
[6]     Q.    Take a look back at Exhibit 12, please.
[7] That was a letter that you sent to Ms. Noble; is that
[8] right?
[9]     A.    Yes.  The letter I sent on September 27th
[10] to Ms. Noble.
[11]    Q.    Okay.  At the very beginning of this, "I
[12] write to inform you that I must reject your recent
[13] offer of employment, whereby you proposed that I
[14] return to Fort Valley State University as a full-time
[15] faculty member working in a diversity relations
[16] position, instead of continuing as dean for the
[17] college of arts and sciences, the position for which I
[18] was hired."
[19]          Is that what you said?
[20]    A.    Correct.  But let's further stipulate that
[21] the rest of the letter that states -- I also state to
[22] them, "please let me know when I may resume my current
[23] position."  It is the last paragraph.  "If I have not
[24] heard from you by 5:00 p.m. on Friday, October 4th,
[25] 2013, I will assume that you are terminating our

Page 95

[1] employment agreement and that I am no longer employed
[2] at Fort Valley."
[3]          And, subsequently, in your No. 15, I was
[4] told that I abandoned my job.  And they refused to
[5] meet with me once we had that one meeting, and I told
[6] them I was going to get legal consultation.  And they
[7] agreed I would meet again, and they would never follow
[8] through.
[9]     Q.    In Exhibit 12, the part you were just
[10] reading, you refer "to my current position."  What is
[11] that?
[12]    A.    Referring to being dean of college of arts
[13] and sciences.
[14]          If I may, I need to use the rest room,
[15] please.
[16]          (Recess from 12:01 p.m. to 12:02 p.m.)
[17]    Q.    (By Mr. McGraw)  We were just talking
[18] about the issues with your being reassigned from the
[19] dean position and given a notice that your contact
[20] would not be renewed.  To the extent that you know,
[21] whose decision was that?
[22]    A.    That was the decision of Linda Noble in
[23] consultation with Ivelaw Griffith.  Because Ivelaw
[24] Griffith, when he just came in, no move as to
[25] academics without consulting Linda Noble.  Because she

Page 96

[1] was also vice chancellor for the USGA Board of
[2] Regents.
[3]     Q.    Do you know whether Tricia Addison was
[4] involved in making that decision?
[5]     A.    I'm sure, as the chief HR officer, she
[6] was.
[7]     Q.    What about Edward Hill?
[8]     A.    In my reassignment, he may have influenced
[9] the decision, but I'm sure -- the ultimate decision
[10] wasn't his, but I'm sure that he may have influenced,
[11] because he and Tricia Addison are close.
[12]    Q.    I'm sorry?
[13]    A.    To the extent that he made a decision, the
[14] decision was not his.  But I'm sure that he may have
[15] influenced it, since he and Tricia Addison are close.
[16] But I definitely know for a fact that it was Ivelaw
[17] Griffith, Linda Noble.  Because Linda Noble is the
[18] person who sits for the Board of Regents who Ivelaw
[19] Griffith goes to whenever he needed advice on any
[20] academic issues.
[21]    Q.    Do you know any personal knowledge of
[22] Edward Hill's influencing Tricia Addison about this?
[23]    A.    I do know that -- again, Dr. -- what's his
[24] name again?  Charles Jones overheard -- not Charles
[25] Jones.  Dr. -- I'm having a blank for a minute.

Case 1:14-cv-00365-LMM-LTW   Document 54   Filed 03/04/15   Page 26 of 33

VICTOR M. BROWN vs.
BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.

VICTOR M. BROWN
August 20, 2014

Page 97

[1]    Q.    Was it Glen Jones?
[2]    A.    Glen Jones overheard -- he told me that he
[3]  overheard Tricia Addison and Hill talk about my
[4]  removal from Fort Valley as dean.
[5]    Q.    Okay.  And we can get back to that after
[6]  the break.
[7]         (Recess from 12:04 p.m. to 12:37 p.m.)
[8]    Q.    (By Mr. McGraw)  Dr. Brown, we're back on
[9]  the record.  And you understand you're still under
[10] oath from this morning?
[11]   A.    Yes, sir.
[12]   Q.    In your interrogatory responses you
[13] indicated that Tricia Addison had said in August 2013
[14] that FVSU needed to see if they could get Dr. Brown in
[15] a position where he would not come back.
[16]        Where did you hear that?
[17]   A.    That was something that was brought to my
[18] attention by one of the program chairs.  Because he
[19] was very disappointed to hear such things from someone
[20] working for human resources.
[21]   Q.    Who was the program chair?
[22]   A.    Dr. Glen Jones.
[23]   Q.    Did he tell you what he thought she meant
[24] by that?
[25]   A.    He told me just what he heard.  That he

Page 98

[1]  was disappointed because he became aware when he got
[2]  there that I was gay, and that was the nature
[3]  surrounding the conversation.
[4]    Q.    What do you mean by that, that was the
[5]  nature surrounding the conversation?
[6]    A.    Part of the reason why they wanted me gone
[7]  was because of the fact that I'm a gay male.
[8]    Q.    Did she say that?
[9]    A.    Repeat.
[10]   Q.    Did he say that Tricia Addison said that
[11] specifically?
[12]   A.    Correct.
[13]   Q.    What exactly do you remember that he told
[14] you she said?
[15]   A.    She referred to the fact that I had -- she
[16] thinks that I have an anger management problem and
[17] that -- she also referenced the fact that --
[18] concerning the fact that they wanted to get me away
[19] from Fort Valley because I'm gay, I'm a gay male.
[20] That -- that was the nature of the conversation that I
[21] had -- that he had with me.
[22]   Q.    Was this before or after the arrest?
[23]   A.    Can you be more specific in your question.
[24]   Q.    I don't know that I can.
[25]        Did he tell you that before or after the

Page 99

[1]  arrest?
[2]    A.    Do you mean the conversation I had with
[3]  Glen Jones?  Is that what you're referring to?
[4]    Q.    Yes.
[5]    A.    It was -- he informed me about it after
[6]  the arrest.
[7]    Q.    And did he tell you when she said that?
[8]    A.    No, he did not.
[9]    Q.    Your interrogatory responses also said
[10] that Edward Hill said that you were dismissed from
[11] your position because, quote, he beat up his
[12] boyfriend.  Where did you hear that?
[13]   A.    I heard that from Dr. Glen Jones and --
[14] there's one other person who mentioned it to me.  I
[15] can't recall at the moment.
[16]   Q.    When did Glen Jones tell you that?
[17]   A.    Again, after my arrest.
[18]        I just want to make it clear for the
[19] record that Glen Jones was not somebody I knew, not
[20] somebody I work with.  Glen Jones is -- found a lot of
[21] this very disturbing to him.  That's why he brought it
[22] to my attention, because I had not known him prior to.
[23]   Q.    Tell me again who he is.  What was his
[24] position?
[25]   A.    He said employed as a program chair in the

Page 100

[1]  college of education.
[2]    Q.    You said that Dr. Hill said you were
[3]  dismissed because you beat up your boyfriend.  So
[4]  presumably that must have been after you were removed
[5]  as dean; is that right?
[6]    A.    That was why I was on administrative
[7]  leave.
[8]    Q.    Your responses also stated that Dr. Hill
[9]  said, quote, he never should have brought his
[10] boyfriend down here.  Where did you hear that?
[11]   A.    Dr. Jones.  And, also, when I just came
[12] down -- as I said prior, Dr. Hill knew I was gay
[13] because of the letter that was sent.  How he was made
[14] privy to that letter, I can only speculate that it
[15] came from one other person that that letter was shared
[16] with.
[17]   Q.    You're saying that's how Dr. Jones knew?
[18]   A.    I'm not talking about Dr. Jones.  You
[19] asked me a question about Dr. Hill.
[20]        Dr. Jones told me what Dr. Hill said.
[21]        Also, when I came down, I --
[22] because I came down first because my partner was
[23] completing his studies, then to follow me down.
[24] Dr. Hill made reference to me as to why he was
[25] following me down.

Case 1:14-cv-00365-LMM-LTW   Document 54   Filed 03/04/15   Page 27 of 33

VICTOR M. BROWN vs.
BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.

VICTOR M. BROWN
August 20, 2014

Page 101

[1]    **Q.**   He made that reference to you?
[2]    **A.**   To me directly, yes.
[3]    **Q.**   What did he say?
[4]    **A.**   That Ryan should have stayed in New
[5] Jersey, where he was -- this was at a time -- when I
[6] came down, he was still responsible to help me find
[7] housing. So he was assisting me still. And we
[8] were -- actually, it was a Sunday after church. We
[9] were going around in his car. We were looking at
[10] houses. And he made the comment to me.
[11]    **Q.**   What was the comment?
[12]    **A.**   Ryan had called, and Ryan -- Ryan was
[13] trying to call me all day, but I was in church. So he
[14] was a bit, you know, perturbed that he wasn't getting
[15] me. And he was concerned because he didn't know what
[16] was going on.
[17]    So after I finished that conversation,
[18] Dr. Hill mentions the fact that Ryan should not be
[19] coming down with me, that he should remain where he
[20] was in Fort Valley -- I'm sorry -- in New Jersey.
[21]    **Q.**   Did he say why?
[22]    **A.**   He did not go into much detail.
[23]    **Q.**   Did you ask him why?
[24]    **A.**   No, I did not. Again, because my personal
[25] life is my personal life. I don't discuss my personal

Page 102

[1] life with people.
[2]    **Q.**   Had you gone to church with Dr. Hill?
[3]    **A.**   Correct. That's when he invited me to his
[4] church.
[5]    **Q.**   What church was that?
[6]    **A.**   I can't remember the name of the church.
[7] It's on Gunn Road somewhere.
[8]    **Q.**   In Fort Valley?
[9]    **A.**   No, in Centerville. It's on Gunn Road in
[10] Centerville.
[11]    **Q.**   You also said in your responses that
[12] Edward Hill said your partner, quote, was the biggest
[13] drag queen in the country, end quote. Where did you
[14] hear that?
[15]    **A.**   Dr. Jones.
[16]    **Q.**   Was this all in the same conversation with
[17] Dr. Jones?
[18]    **A.**   Yes. Part of the problem was Dr. Jones
[19] was very perturbed that such comments were coming from
[20] persons who worked in higher education.
[21]    **Q.**   We've covered a number of things today.
[22] Are there any other statements or comments that you
[23] know of that anybody at Fort Valley State made about
[24] your sexual orientation?
[25]    **A.**   In a meeting with -- I think we were

Page 103

[1] interviewing for the director of corporate giving that
[2] was being shared by Dr. Melody Carter. And after one
[3] of the candidates exited the room and -- in the
[4] intermission, she said there was another candidate --
[5] we were discussing the candidates -- which one was
[6] more suitable for the job.
[7]    **Q.**   For the corporate giving job?
[8]    **A.**   Right. I think that was the title of the
[9] position. And she said there was another guy that
[10] interviewed very well on Skype. However, it appeared
[11] that he was gay. And then she said, we don't want
[12] those type of people working here.
[13]    **Q.**   Who said that?
[14]    **A.**   Dr. Melody Carter.
[15]    **Q.**   Dr. Melody Carter?
[16]    **A.**   Correct. And Dr. Melody Carter is one
[17] of -- the most influential vice president at Fort
[18] Valley.
[19]    **Q.**   When was this?
[20]    **A.**   This was back in probably August,
[21] September. I would have to check on the day. But I
[22] can't be specific. But it was a meeting where there
[23] were several senior administrators and deans
[24] interviewing candidates for that position.
[25]    And what perturbed me is that comment we

Page 104

[1] don't want these people here.
[2]    **Q.**   Do you know whether she knew then that you
[3] were gay?
[4]    **A.**   Yes, she did. The letter -- again,
[5] Dr. Hill told me that, before I got there, Dr.
[6] Gray-Singh and Melody Carter had a problem with me
[7] coming here being gay.
[8]    **Q.**   Had she ever said anything directly to you
[9] about your orientation?
[10]    **A.**   People said things about my orientation
[11] behind my back. Not to my face.
[12]    **Q.**   Okay. Do you remember who the candidate
[13] was who she thought seemed to be gay?
[14]    **A.**   I was not a part of the Skype interview
[15] that they did. She didn't tell us then who the --
[16] what the name of the candidate was. And I found it
[17] very disturbing.
[18]    **Q.**   Were you on the search committee?
[19]    **A.**   Yes, I was.
[20]    **Q.**   But you never knew who that candidate was?
[21]    **A.**   The search committee started before I got
[22] there. When I started to work at Fort Valley, I was
[23] incorporated into the search committee, but part of
[24] the process occurred prior to me.
[25]    **Q.**   So you never knew who that candidate was?

VICTOR M. BROWN vs.
BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.

VICTOR M. BROWN
August 20, 2014

Page 105

[1]     **A.**     No idea.

[2]     **Q.**     Were you under the impression it was a man
[3] or it was a woman?

[4]     **A.**     It was a male.

[5]     **Q.**     And do you know --

[6]     **A.**     She said "he," "he."

[7]     **Q.**     Do you know who ultimately got the job?

[8]     **A.**     The position, when I was -- when all this
[9] was going on, the position had not been filled.  So
[10] that is something that you would have to find out from
[11] Fort Valley.

[12]     **Q.**     Okay.  So by the time you left, it was
[13] still vacant?

[14]     **A.**     Correct.

[15]     **Q.**     You mentioned earlier on -- that you felt
[16] like you had been retaliated against, because you said
[17] that Fort Valley was -- I think you said trampling on
[18] your rights.  Is that right?

[19]     **A.**     My exit on the 28th, I think, of August, I
[20] submitted a letter explaining to them that I felt as
[21] though I was being discriminated against under
[22] Title 7.  And I outlined some stuff in the letter that
[23] I sent to them.  They did not respond to the letter.
[24] The next thing I heard was -- I was called into a
[25] meeting where my supervisor told me I'm being demoted,

Page 106

[1] I'm being reclassified, my contract will not be
[2] renewed.  And to that point, neither the Board of
[3] Regents nor Fort Valley nor the president had
[4] responded to my letter.

[5]          So on the 18th, that's when they told me
[6] that I would not be reinstated.  And on the 20th I
[7] told them that I felt as though I was being retaliated
[8] against, because the letter that I sent to them.

[9]          (Defendants' Exhibit 16 was marked for
[10]          identification.)

[11]     **Q.**     (By Mr. McGraw)  Take a look at
[12] Exhibit 16, please, and tell me if you recognize that.

[13]     **A.**     Yes.  This appears to be the second email
[14] that I sent to them.

[15]     **Q.**     An if you look through, it's an email
[16] chain.

[17]     **A.**     Correct.  These are the two emails, slash,
[18] letters that I sent.

[19]     **Q.**     Okay.  And you did refer to them as
[20] letters.  Did you send these both in letter form and
[21] as emails?

[22]     **A.**     They were sent both in letter form and
[23] email.  And they were also sent by registered mail.

[24]     **Q.**     Okay.  The letters form would have been
[25] identical to the email; they were just in different

Page 107

[1] formats; is that right?

[2]     **A.**     Correct.

[3]     **Q.**     So if you go to the back, the earlier
[4] email -- this starts on the second page.  It says 429
[5] at the bottom -- is from August 30th, at 11:17, a.m.

[6]          Is that the first letter you're talking
[7] about that you sent saying that you were being
[8] discriminated against under Title 7?

[9]     **A.**     Correct.

[10]     **Q.**     And on the front page is, I guess, the
[11] follow-up you referred to, where you're saying you
[12] never responded to me --

[13]     **A.**     Correct.

[14]     **Q.**     -- the first time?

[15]     **A.**     That is correct.

[16]     **Q.**     Okay.  Did you send any other letters or
[17] emails to either the Board of Regents or Fort Valley
[18] State for which you feel like you were retaliated
[19] against?

[20]     **A.**     All the letters I sent to both the Board
[21] of Regents and to Fort Valley State University.

[22]     **Q.**     But I'm asking were there any others
[23] besides these two?

[24]     **A.**     In terms pertaining to the fact that I was
[25] retaliated against?

Page 108

[1]     **Q.**     Yes.

[2]     **A.**     No.  I sent the -- the first I sent, I did
[3] not get a response.  And I think I resent it, if I'm
[4] not mistaken.  But I can always double-check my email.

[5]          But I think I sent the first letter, which
[6] is this one, and I did not get a response.  And I
[7] resent it to both the Board of Regents and Fort
[8] Valley.

[9]     **Q.**     And then you sent this --

[10]     **A.**     After I was told that I'm being,
[11] basically, demoted without any hearing, without any
[12] consultation, without being a part of their thorough
[13] investigation, I told them that I felt I was being
[14] retaliated against.

[15]          Because if they were supposed to have a
[16] thorough, impartial investigation, then I should have
[17] been questioned.  My partner should have been
[18] questioned.  And neither of us was called in to be
[19] questioned by anyone at Fort Valley or the Board of
[20] Regents' office.

[21]     **Q.**     Okay.  What reasons do you have to believe
[22] that the decisions about removing you as dean and not
[23] renewing your contract were based on this letter or
[24] email that you had sent?

[25]     **A.**     Because when Linda Noble put me on the --

VICTOR M. BROWN vs.
BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.

VICTOR M. BROWN
August 20, 2014

Page 109

[1]  the day she put me on administrative leave, in the
[2]  morning we had a discussion where she told me that I
[3]  would not be removed as dean, that I would not be
[4]  facing any administrative leave.
[5]         When the call came in and I spoke to the
[6]  president, spoke to her, that's when she told me -- I
[7]  was under the impression that Mr. Jones was going to
[8]  be the acting investigator and that I would be called
[9]  and restated into my position.
[10]         When I got home, it bothered me, because I
[11]  was frank and forthcoming with her.  I sent the
[12]  letter.  I heard nothing from them.  Only to be told,
[13]  what, a month later, that, based on their thorough
[14]  investigation, that -- based on their thorough
[15]  investigation, I'm not going to be restated and that
[16]  my behavior is not along with their leadership
[17]  philosophy, when I knew they have employed other
[18]  people who have had legal problems at the university,
[19]  and they didn't deal with them the same way they dealt
[20]  with me.
[21]         Second, if they were going to do a
[22]  thorough investigation, I wasn't asked for anything
[23]  that happened.  I was not asking about anything that
[24]  happened.  And so I think it was in retaliation for
[25]  the fact that I sent the letter telling them that I

Page 110

[1]  think I was being discriminated against.
[2]     Q.    Do you also think that your removal as
[3]  dean and the nonrenewal of your contract was based on
[4]  your being a man in a relationship with another man?
[5]  Which is, I believe, what you had said earlier this
[6]  morning about the tenure issue.
[7]         MS. MOLDEN:  I'm going to object to the
[8]  form.
[9]         THE WITNESS:  I don't think if it was a
[10]  woman that things would have progressed the same
[11]  way it did.  I think a lot of what was done, has
[12]  been done to me is linked to the fact that -- due
[13]  to my sex, that I'm a male in a relationship with
[14]  another male.
[15]     Q.    (By Mr. McGraw)  You've also alleged in
[16]  your lawsuit that at least some of the defendants had
[17]  slandered you or defamed you.  What statements do you
[18]  feel like were slanderous or defamatory, whichever?
[19]     A.    One, Dr. Gray-Singh -- first of all, the
[20]  letter about me being gay should not have gone out to
[21]  anyone.  It should have remained confidential, because
[22]  I was assured it would be confidential.
[23]         Two, someone in Saudi Arabia was told by
[24]  someone else at Fort Valley that I was arrested.
[25]  Three, Dr. Noble sent the letter to the entire Fort

Page 111

[1]  Valley family telling them about the arrest, which was
[2]  something that was unprecedented, was never done
[3]  before.
[4]     Q.    Any other statements?
[5]     A.    I know that comments were made to other
[6]  non-Fort Valley people about me being gay and about me
[7]  being on academic suspension -- administrative leave,
[8]  which was -- in a way, could have negatively affected
[9]  my career.  People saying things around campus about
[10]  me being gay.
[11]         And that is all -- the weird part about
[12]  everything is that, when any discussion comes up, it's
[13]  never been about the fact that I didn't perform a good
[14]  job.  Because I was told by the president, by Linda
[15]  Noble, by the administration that I was doing an
[16]  excellent job as a dean.
[17]         None -- my work ethics, what I did, never
[18]  ever came up into question never even once.  It was
[19]  always about me being gay.
[20]     Q.    These other statements you were just
[21]  referring to, are they the same statements that we've
[22]  talked about this morning?
[23]     A.    Correct; about all the people being told
[24]  that I'm gay and talking about me be gay.
[25]     Q.    I'm just trying to make sure that there

Page 112

[1]  aren't any other statements that I haven't already
[2]  heard about today that you know of.
[3]     A.    There may be.  But as it comes to
[4]  recollection, I've said them all.
[5]     Q.    And you've referred to earlier the letter
[6]  that went out just a minute ago.  Are you talking
[7]  about Exhibit 8, the email --
[8]     A.    That went to the student.  But Exhibit 8,
[9]  yes.  But also an email that was sent by Dr. Hill
[10]  to -- I can't remember her name.  She has a -- she
[11]  runs a research -- she runs a think tank, if you will,
[12]  in D.C.
[13]         And she was told that I'm being placed on
[14]  administrative leave and I'm being separated from the
[15]  college.  It's a long email.  I can't fully remember
[16]  the contents of that, which I think was inappropriate.
[17]  Because she had no bearing as to what was going on at
[18]  Fort Valley.
[19]         As I said before, the fact that somebody
[20]  in Saudi Arabia was sent information about the fact
[21]  that -- about what happened.  And like I said, none of
[22]  this ever had anything to do with the quality or
[23]  quantity of work that I did.  It's all surrounding my
[24]  sexual orientation.
[25]     Q.    The email from Dr. Hill, do you know who

VICTOR M. BROWN vs.
BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.

VICTOR M. BROWN
August 20, 2014

Page 113

[1] the woman -- I think you said it's a woman --
[2] **A.** I cannot recall her name.
[3] **Q.** Do you know what the D.C. think tank was?
[4] **A.** It's a group where -- I can't recall her
[5] name, but I'm sure that I can find her email
[6] somewhere.
[7] **Q.** Was this the same as WISE Scholars?
[8] **A.** No. It's something different.
[9] **Q.** Do you have a copy of that email?
[10] **A.** Everything was submitted to my attorney.
[11] But I'm sure that I can go and find another copy. And
[12] I'm sure she turned everything over.
[13] **Q.** I don't remember seeing that. But we can
[14] figure that out too.
[15] You also talk about the private disclosure
[16] of embarrassing facts. Does that relate again to --
[17] you've talked about your confidential letter about the
[18] New Jersey arrest. You said it was shown to other
[19] people. And you also said that -- just what you were
[20] just saying about these emails that went out about
[21] your arrest. Are those the things that you're
[22] referring to about embarrassing prior facts?
[23] **A.** Yes. And comments about my boyfriend
[24] being a drag queen. You know, all those comments were
[25] embarrassing facts.

Page 114

[1] **Q.** The same things we've already talked
[2] about?
[3] **A.** Correct.
[4] **Q.** Did Dr. Hill ever meet your boyfriend?
[5] **A.** Yes, he has.
[6] **Q.** This may seem like a silly question. But
[7] what do you think Dr. Hill may have meant about him
[8] being the biggest drag queen?
[9] **A.** Dr. Hill discriminated against people who
[10] were gay. Dr. Hill had a problem with people who were
[11] gay. That's the only thing I can allude to.
[12] **Q.** You started your job as dean at TCI in
[13] February of 2014; is that right?
[14] **A.** That is correct.
[15] **Q.** Have you suffered any financial harm as a
[16] result of what happened at Fort Valley State?
[17] **A.** I have.
[18] **Q.** What is that?
[19] **A.** What have I suffered? I uprooted myself
[20] and paid for my relocation to Fort Valley. When I
[21] came here, my partner gave up a job offer for a very
[22] lucrative salary. I had to relocate myself back from
[23] Fort Valley -- and my partner. I went back to a city
[24] where I'm making less than I used to make when I came
[25] here. The fact that I was offered tenure and my

Page 115

[1] tenure was revoked. So all of those.
[2] **Q.** What job offer did your partner give up?
[3] **A.** He was -- he's a vet. And he's a nurse.
[4] He was offered a position with the VA hospital system.
[5] **Q.** He was offered what kind of position?
[6] **A.** Nursing job with the VA hospital system.
[7] And he had to refuse that offer because he was going
[8] to be moving down here with me.
[9] **Q.** And that was in New York or New Jersey?
[10] **A.** That was in New Jersey.
[11] **Q.** How much was that going to pay?
[12] **A.** That was going to pay him over 80,000 per
[13] year to start out. And within that system -- because
[14] he's a vet, the potential for him to rapidly promote
[15] was phenomenal. And that something's that he gave up.
[16] And with each level of promotion comes a new salary
[17] increase.
[18] **Q.** Just so we're clear, when you're saying
[19] he's a vet, he's a military veteran?
[20] **A.** Yes. He was in the Navy.
[21] **Q.** Did he have a job in Georgia?
[22] **A.** He got a job when he came down here.
[23] **Q.** Doing what?
[24] **A.** As a nurse.
[25] **Q.** Where?

Page 116

[1] **A.** Medical Central of Central Georgia.
[2] **Q.** How much did he make there?
[3] **A.** I'm not sure what he made. His salary was
[4] way less than the 80,000 that he was offered.
[5] **Q.** What does he do now?
[6] **A.** He's a nurse.
[7] **Q.** Where?
[8] **A.** He just got back -- he just got a job with
[9] the VA hospital.
[10] **Q.** At the same VA hospital as before?
[11] **A.** No, it's a different VA hospital.
[12] **Q.** How much does he make there?
[13] **A.** I'm not quite sure what he's making at the
[14] moment.
[15] **Q.** Do you know if it's more or less than
[16] 80,000?
[17] **A.** I'm not sure. You'd have to ask him.
[18] **Q.** How much did you make at Burlington County
[19] College?
[20] **A.** 85 something, I think.
[21] **Q.** Other than financial, have you suffered
[22] any other harm as a result of what happened at Fort
[23] Valley?
[24] **A.** Emotional harm. My career has been
[25] damaged by all of this. When I came down here, I came

VICTOR M. BROWN vs.
BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.

VICTOR M. BROWN
August 20, 2014

---

Page 117

[1] down, as I said, with tenure, which is something that
[2] is very valued for anybody in academics.  When you
[3] have tenure, it's something that is valued.  It was
[4] part of my negotiations.
[5]         When I was at Fort Valley -- BCC, I was on
[6] fast track to move forward.  Me giving that up and
[7] coming down here, me having to restart again as a
[8] dean.  One of my safety nets that I -- that's when I
[9] came down, I negotiated getting tenure, which was
[10] revoked.
[11]     Q.    Did you have tenure at Burlington County
[12] College?
[13]     A.    Burlington County College was a two-year
[14] college.  So I did not want tenure at a two-year
[15] college.
[16]     Q.    So, no, you did not?
[17]     A.    No, I did not.
[18]     Q.    Do you have tenure at TCI?
[19]     A.    TCI does not do tenure.
[20]         And just to be clear, tenure at a two-year
[21] and tenure at a four-year are two completely different
[22] kettle of fishes.
[23]     Q.    How so?
[24]     A.    Same profession, but two levels, two
[25] different things you're dealing with.

---

Page 118

[1]     Q.    What was the emotional harm that you
[2] referred to?
[3]     A.    The embarrassment.  Well, first of all,
[4] for my sex life to be drawn over the place and to be
[5] spread far and wide by Fort Valley.  Second of all,
[6] for my arrest to be -- all in sundry.  Thirdly, for
[7] people I trusted with information to put it out there.
[8] The emotional strain of being removed from my position
[9] without due process, for -- to be told that there's an
[10] impartial investigation with people I trusted to
[11] safeguard my rights did not do so.  I was not involved
[12] in that.  And the list goes on.  There's just too
[13] much.
[14]     Q.    What you're telling me about are things
[15] that harmed you, actions that harmed you.  But what I
[16] was getting at was how have those things affected you?
[17] What is the emotional harm that you feel like you've
[18] suffered as a result of this?
[19]     A.    Spending days at home, all I'm doing is
[20] just sitting there thinking about what's going on.
[21] The headaches that come with it.  The -- for every
[22] time I apply for a job after that, having to explain
[23] to people why I spent such a short time at Fort
[24] Valley.  There's a lot of stress that went into that.
[25] Uprooting all myself down here just for all this to

---

Page 119

[1] happen, when I was comfortable and okay where I was.
[2]     Q.    Your interrogatory responses said that you
[3] have not seen a doctor or therapist or counselor about
[4] any of these emotional harms.  Is that still true?
[5]     A.    I've spoken to my pastor, who knows about
[6] the fact that I'm gay.  And I've spoken to my -- a
[7] friend of mine who is a psychiatrist.  But I've not
[8] officially gone to a doctor.  I've spoken to friends
[9] about it who have given me advice, friends who are a
[10] professional in the field.  And I've also spoken to my
[11] spiritual leader/advisor, whichever you want to call
[12] it, who has given me advice.
[13]     Q.    Who is the pastor that you talked to?
[14]     A.    Bishop Nolan Torbert.
[15]     Q.    And where is he the pastor?
[16]     A.    True Deliverance Holiness Church.
[17]     Q.    And then you referred to a spiritual
[18] advisor.  Is that the same person?
[19]     A.    Correct.
[20]     Q.    And then you said a friend who's a
[21] psychiatrist?
[22]     A.    Yes.
[23]     Q.    Who was that?
[24]     A.    Ashley Miller.
[25]     Q.    Ashley Miller?

---

Page 120

[1]     A.    Correct.
[2]     Q.    I assume they're both in the New York/New
[3] Jersey area?
[4]     A.    No.  Dr. Torbert is also -- Bishop Nolan
[5] Torbert, he is in the Alabama region.  Ashley's in the
[6] D.C. region.
[7]     Q.    How do you know the pastor?
[8]     A.    I used to go to his church.
[9]     Q.    Okay.  As part of your lawsuit, are you
[10] asking the court to put you back into your job at Fort
[11] Valley State, your dean job?
[12]     A.    At the end of the day, I'll be discussing
[13] this with my lawyer.  Do I necessarily want to go back
[14] to Fort Valley State?  In everything that they have
[15] done, they have tarnished my reputation and prevented
[16] me to be effective in any way, shape, form, in any
[17] capacity.
[18]         By the mere fact that Dr. Noble is going
[19] to send out an email to the entire population,
[20] undermining my credibility and my authority there as a
[21] dean.  Or even if I did -- or even as a professor.
[22]         So would I be able to function
[23] effectively?  No, I wouldn't.  Would I be able to be
[24] successful at Fort Valley?  No, I would not.  Do I
[25] have any -- do I have any confidence in any of the

---

VICTOR M. BROWN vs.
BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.

VICTOR M. BROWN
August 20, 2014

Page 121

[1] leadership there, HR, executive staff?  No, I don't.
[2]    **Q.**   Is there any particular amount of money
[3] that you're asking for that you believe would
[4] compensate you for your harms?
[5]    **A.**   That's a legal question.  And that's --
[6] because I'm sure there are several factors from a
[7] legal standpoint that goes into calculating that, so
[8] that is something that I would have to sit down and
[9] discuss with my attorney.
[10]    **Q.**   So there's not anything that you know
[11] about right now?
[12]    **A.**   That is something I have to discuss with
[13] my attorney when the time comes.
[14]    **Q.**   So, no, there's not an amount you know
[15] about right now?  It's a yes or no question.
[16]    **A.**   No, I do not have an amount in mind.
[17]    **Q.**   Thank you.  In your initial disclosures,
[18] you listed the following people as witnesses who may
[19] know about facts around your case.  They are Canter
[20] Brown, William Hill -- and I assume that was --
[21]    **A.**   Edward Hill.
[22]    **Q.**   -- Larry Rivers, Glen Jones, and Megan
[23] Fields.  And I believe we've discussed all of them
[24] today.  Other than those people and other people that
[25] you've already mentioned today, is there anyone else

Page 122

[1] you know about who would have information about your
[2] case?
[3]    **A.**   From Fort Valley?  Not that I can think
[4] of.
[5]    **Q.**   From anywhere that would know anything
[6] about your case.
[7]    **A.**   Just what I've mentioned, that I
[8] have discussed it in terms of getting their advice,
[9] getting their support and in order to move forward, I
[10] discussed it with my best friend as well -- my two
[11] best friends as well.
[12]    **Q.**   Okay.  And who are they?
[13]    **A.**   That is Richard Riley, and that is Kevin
[14] Walker.
[15]    **Q.**   But they wouldn't have any firsthand
[16] knowledge of what happened at the time; is that right?
[17] You kind of sought their counsel afterwards?
[18]    **A.**   Basically, just as a sound board to get
[19] rid of stress and tension.
[20]    **MR. MCGRAW:** All right.  Will you give us
[21] a couple of minutes.
[22]    (Recess from 1:08 p.m. to 1:18 p.m.)
[23]    **Q.**   (By Mr. McGraw)
[24]    **MR. MCGRAW:** That's all the questions that
[25] I have today.  We would just reserve the right to

Page 123

[1] possibility reopen the deposition, if necessary,
[2] upon resolution of the issue about Dr. Brown's
[3] notes and/or the email he mentioned.
[4]    **MS. MOLDEN:** You're saying --
[5]    **MR. MCGRAW:** If we need to follow-up on
[6] those, we reserve the right to do that.  We can
[7] discuss that later on.
[8]    **MS. MOLDEN:** Certainly.
[9]    (Deposition concluded at 1:18 p.m.)
[10]    (Pursuant to Rule 30(e) of the Federal
[11] Rules of Civil Procedure and/or O.C.G.A. 9-11-30(e),
[12] signature of the witness has been reserved.)

Page 124

[1]            CERTIFICATE OF COURT REPORTER
[2]
[3] STATE OF GEORGIA:
[4] COUNTY OF FULTON:
[5]
[6]        I hereby certify that the foregoing
[7] transcript was reported as stated in the caption and
[8] the questions and answers thereto were reduced to
[9] writing by me; that the foregoing 123 pages represent
[10] a true, correct, and complete transcript of the
[11] evidence given on Wednesday, August 20, 2014, by the
[12] witness, Victor M. Brown, who was first duly sworn by
[13] me.
[14]        I certify that I am not disqualified
[15] for a relationship of interest under
[16] O.C.G.A. 9-11-28(c); I am a Georgia Certified Court
[17] Reporter here as an independent contractor of
[18] JPA Reporting, LLC who was contacted by
[19] Christopher A. McGraw, Esq. to provide court reporting
[20] services for the proceedings; I will not be taking
[21] these proceedings under any contract that is
[22] prohibited by O.C.G.A. 15-14-37(a) and (b) or
[23] Article 7.C. of the Rules and Regulations of the
[24] Board; and by the attached disclosure form I confirm
[25] that neither I nor JPA Reporting, LLC are a party to a

Case 1:14-cv-00365-LMM-LTW   Document 54   Filed 03/04/15   Page 33 of 33

VICTOR M. BROWN vs.
BRD OF REGENTS OF THE UNIV SYSTEM OF GA., et al.

VICTOR M. BROWN
August 20, 2014

**Page 125**

[1]  contract prohibited by O.C.G.A. 15-14-37(a) and (b) or
[2]  Article 7.C. of the Rules and Regulations of the
[3]  Board.
[4]          This 28th of August, 2014.
[5]
[6]
[7]
[8]
[9]          KATE E. COCHRAN
             CERTIFIED COURT REPORTER
[10]         GEORGIA CERTIFICATE NO. CCR-2722
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

**Page 126**

[1]          DISCLOSURE OF NO CONTRACT
[2]
[3]          I, Lynn Pyles, do hereby disclose pursuant
[4]  to Article 10.B of the Rules and Regulations of the
[5]  Board of Court Reporting of the Judicial Council of
[6]  Georgia that JPA Reporting, LLC was contacted by the
[7]  party taking the proceedings to provide court
[8]  reporting services for these proceedings and there is
[9]  no contract that is prohibited by O.C.G.A. 15-14-37(a)
[10] and (b) or Article 7.C. of the Rules and Regulations
[11] of the Board for the taking of these proceedings.
[12]         There is no contract to provide reporting
[13] services between JPA Reporting, LLC or any person with
[14] whom JPA Reporting, LLC has a principal and agency
[15] relationship nor any attorney at law in this action,
[16] party to this action, party having a financial interest
[17] in this action, or agent for an attorney at law in
[18] this action, party to this action, or party having a
[19] financial interest in this action.  Any and all
[20] financial arrangements beyond our usual and customary
[21] rates have been disclosed and offered to all parties.
[22]         This 28th of August, 2014.
[23]
[24]         LYNN PYLES, FIRM REPRESENTATIVE
[25]         JPA REPORTING, LLC

**Page 127**

[1]  DEPOSITION OF:  VICTOR M. BROWN /KEC
[2]       I do hereby certify that I have read all
     questions propounded to me and all answers given by me
[3]  on August 20, 2014, taken before Kate E. Cochran, and
     that:
[4]
[5]       1)  There are no changes noted.
          2)  The following changes are noted:
[6]       Pursuant to Rule 30(e) of the Federal Rules of
     Civil Procedure and/or the Official Code of Georgia
[7]  Annotated 9-11-30(e), both of which read in part:  Any
     changes in form or substance which you desire to make
[8]  shall be entered upon the deposition...with a
     statement of the reasons given...for making them.
[9]  Accordingly, to assist you in effecting corrections,
     please use the form below:
[10]
[11] Page No.        Line No.        should read:
[12]
[13]    Page No.        Line No.        should read:
[14] Page No.        Line No.        should read:
[15]
[16]    Page No.        Line No.        should read:
[17] Page No.        Line No.        should read:
[18]
[19]    Page No.        Line No.        should read:
[20] Page No.        Line No.        should read:
[21]
[22]    Page No.        Line No.        should read:
[23] Page No.        Line No.        should read:
[24]
[25]    Page No.        Line No.        should read:

**Page 128**

[1]  DEPOSITION OF:  VICTOR M. BROWN /KEC
[2]  Page No.        Line No.        should read:
[3]
[4]     Page No.        Line No.        should read:
[5]  Page No.        Line No.        should read:
[6]
[7]     Page No.        Line No.        should read:
[8]  Page No.        Line No.        should read:
[9]
[10]    Page No.        Line No.        should read:
[11] Page No.        Line No.        should read:
[12]
[13]    Page No.        Line No.        should read:
[14]
[15]    If supplemental or additional pages are necessary,
     please furnish same in typewriting annexed to this
[16] deposition.
[17]
[18]         VICTOR M. BROWN
     Sworn to and subscribed before me,
[19] This the       day of           , 20   .
[20]
[21] Notary Public
     My commission expires:
[22]
[23] Please forward corrections to:
[24]         JPA Reporting, LLC
     1776 Peachtree Street, NW, Suite 230-S
[25]         Atlanta, Georgia 30309
             404-853-1811